STATE OF CONNECTICUT *v.* LORENZO OSBOURNE
(AC 32553)

Lavine, Bear and Sheldon, Js.

Argued April 9—officially released October 16, 2012

*Jennifer Bourn*, assistant public defender, for the appellant (defendant).

*Linda Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Pamela J. Esposito*, senior assistant state's attorney, for the appellee (state).

SHELDON, J. The defendant, Lorenzo Osbourne, appeals from the judgment of conviction rendered against him following a jury trial of three counts of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2), 53a-59 (a) (1) and 53-202k, and one count of interfering with an officer in violation of General Statutes § 53a-167a.[1] On appeal, the defendant claims that (1) there was insufficient evidence to sustain his conviction of three counts of attempt to commit assault in the first degree because the state failed to prove the essential elements of that offense beyond a reasonable doubt as to any of his alleged victims, three Bridgeport police officers; (2) the court erred in denying the jury's request to replay the video of the events here at issue, as recorded by the camera on the Taser gun of one of the officers, in the privacy of the deliberating room; and (3) the court erred in failing to instruct the jury on the intent element of the offense of interfering with an officer. We affirm the judgment of the trial court.

Based upon the testimony of the state's witnesses, the jury was presented with the following evidence upon which to base its verdict. On August 29, 2009, at approximately 4:30 p.m., two uniformed Bridgeport police officers, Jorge Larregui and Carlos Vasquez, responded to a burglar alarm call at a church located at the corner of Logan Street and Stratford Avenue in Bridgeport. As the officers drove toward the church in their marked police cruiser, they observed the defendant and another man standing on the corner near the church. While the officers were speaking to people in

---

[1] The defendant also was convicted of carrying a pistol without a permit in violation of General Statutes § 29-35 (a), criminal possession of a firearm in violation of General Statutes § 53a-217 (a) and reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a). The defendant makes no claim on appeal with respect to his conviction of those charges.

the church parking lot about the burglar alarm, they observed the defendant and the other man walk past them and enter an adjacent lot on which there was an abandoned building. Upon determining that the burglary call was a false alarm, the officers returned to their vehicle and resumed patrolling the area.

As they continued their patrol, the officers made further observations of the defendant and his companion. After several minutes, because the area was known for its high level of drug activity and the defendant and his companion had emerged from the empty lot, the officers determined that the men were suspicious and decided to investigate them. To that end, they stopped their cruiser approximately ten to twenty feet in front of the men and got out to approach them. When this occurred, the defendant and the other man immediately began to flee, prompting Vasquez to grab the defendant, who physically resisted and threw punches at him, and Larregui to detain the other man, who struggled with him until he drew his Taser gun and threatened to use it if the man continued to resist. When the Taser gun was turned on, its camera began to record the encounter as it unfolded. Officer Damien Csech, another uniformed Bridgeport police officer, then arrived at the scene and took control of the man with whom Larregui had been struggling, freeing Larregui to assist Vasquez in his efforts to subdue the defendant. After Csech handcuffed the other man and searched him for weapons, he too turned his attention to the defendant.

Vasquez responded to the defendant's initial efforts to resist him by putting him in a choke hold and repeatedly ordering him to get down on the ground. Although Vasquez succeeded in getting the defendant down onto his hands and knees, the defendant continued to struggle with him and to defy his repeated orders to lie down on the ground. In the course of such continuing resistance, while both Vasquez and Csech were attempting to

restrain the defendant physically, Larregui tased the defendant in the back, causing him to holler out in pain.

The officers testified, without objection, as to the operation and effects of a Taser gun. They explained that, when a Taser is deployed, it fires two prongs at the targeted person, which stay connected to the Taser gun by conductive wire. When the Taser is activated and the target is receiving an electrical shock from it, a loud, steady ticking sound can be heard. That ticking sound continues for the duration of each tasing cycle, which lasts approximately five seconds. Generally speaking, the shock from the Taser completely incapacitates the target for the duration of the cycle. At the end of the cycle, however, the target's normal functioning is immediately restored.

After the first five second tasing cycle, when the defendant continued to struggle with Vasquez, Larregui tased him again. Immediately after that second cycle ended, the defendant quickly reached down to his right shorts pocket, from which he grabbed and partially removed a gun. Upon spotting the gun, which he first became aware of at that point, Vasquez immediately stepped in between the defendant's right side and right arm, preventing the defendant from reaching downward again. Moments later, Larregui tased the defendant a third time.

Notwithstanding Vasquez' position between the defendant's right side and right arm from the time the gun first appeared until the initiation of the third tasing cycle, the officers testified that the defendant held the gun in his right hand during this third cycle until it fell to the ground and discharged. After the gun fell, Larregui testified that he kicked it out of the defendant's reach. Thereafter, as the defendant continued to struggle, Larregui tased him twice more before he was finally placed in handcuffs.

The state also presented testimony from Marshall Robinson, a firearms examiner for the Bridgeport police department. Robinson testified, based upon his examination of the gun, that it was a five shot, .32 caliber revolver which, despite having a broken trigger return spring, was operable in either single action or double action mode. The hammer of the gun, which had to be cocked in order to be fired in either mode, could be cocked in two ways, either by pulling back the hammer manually or by pulling the trigger. Although the hammer was cocked when Robinson received the gun for examination, he could not say how or when it had been cocked. Even so, he opined that the hammer had not likely been cocked by accident. When Robinson was given the gun to examine, he was also given four live cartridges and one cartridge case from which a round had been discharged.

At the end of trial, the defendant was found guilty of three counts of attempt to commit assault in the first degree and one count each of carrying a pistol without a permit, criminal possession of a firearm, reckless endangerment in the first degree and interfering with an officer. The court sentenced the defendant on these charges to a total effective sentence of fifteen years incarceration, execution suspended after ten years, and three years probation, broken down as follows: on the three counts of attempt to commit assault in the first degree, concurrent terms of fifteen years incarceration, execution suspended after ten years, and three years probation;[2] on the count of criminal possession of a firearm, a concurrent term of two years incarceration; and on the three separate counts of carrying a pistol without a permit, reckless endangerment in the first degree and interfering with an officer, concurrent terms

[2] The court enhanced the defendant's sentence on these counts pursuant to § 53-202k.

of one year incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the evidence was insufficient to sustain his conviction of three counts of attempt to commit assault in the first degree because the state failed to prove the essential elements of that offense beyond a reasonable doubt as to any of his victims. We disagree.

"The standard of review [that] we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the

trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence. . . . Indeed, direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . [A]ny such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded [on] the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 656–58, 1 A.3d 1051 (2010).

As it applies to this case, § 53a-49 (a) (2) provides in relevant part that "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . intentionally does . . . anything which, under the circumstances as he believes them to be, is an act . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Section § 53a-59 (a), in turn, provides in relevant part that "[a] person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument . . . ." Accordingly, a conviction of attempt

to commit assault in the first degree, in violation of §§ 53a-49 (a) (2) and 53a-59 (a) (1), requires proof beyond a reasonable doubt of two elements: (1) that while acting with the intent to cause serious physical injury to the victim by means of a deadly weapon or dangerous instrument, (2) the defendant intentionally took a substantial step in a course of conduct planned to cause such injury to the victim.

To understand the first element, the intent or purpose element of attempt to commit assault in the first degree, two statutory definitions must be considered. First, "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ." General Statutes § 53a-3 (11). Second, " '[s]erious physical injury' means physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (4). In light of these definitions, the intent or purpose element of attempt to commit assault in the first degree requires proof that, when the defendant engaged in the conduct claimed to constitute the offense, it was his conscious objective or purpose to cause serious physical injury, defined as aforesaid, to his victim.

To understand the second element, the substantial step or conduct element of attempt to commit assault in the first degree, as here alleged, three additional statutory definitions must be considered. First, to constitute a substantial step in a course of conduct planned to culminate in the commission of a crime, an actor's conduct must be "strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative

of the actor's criminal purpose, shall not be held insufficient as a matter of law . . . (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances . . . ." General Statutes § 53a-49 (b). "This standard focuses on what the actor has already done and not what remains to be done. . . . The substantial step must be at least the start of a line of conduct which will lead naturally to the commission of a crime. . . . What constitutes a substantial step in any given case is a question of fact." (Internal quotation marks omitted.) *State* v. *Robinson*, 127 Conn. App. 1, 7, 15 A.3d 648, cert. denied, 300 Conn. 942, 17 A.3d 477 (2011). Where, then, as here, the crime allegedly attempted was assault in the first degree in violation of § 53a-59 (a) (1), the act claimed to constitute a substantial step must be proved to have been strongly corroborative of the defendant's alleged purpose of causing serious physical injury to his alleged victim by means of a deadly weapon or a dangerous instrument.

The term deadly weapon, as used in this case, means "any weapon, whether loaded or unloaded, from which a shot may be discharged . . . ." General Statutes § 53a-3 (6). The term dangerous instrument, in turn, is defined in relevant part to include "any instrument . . . which, under the circumstances in which it is used or attempted . . . to be used, is capable of causing death or serious physical injury . . . ." General Statutes § 53a-3 (7). Under those definitions, an operable pistol or revolver is a deadly weapon, which, when used or

attempted to be used to shoot and cause serious physical injury to another person, also constitutes a dangerous instrument. Thus, the state can satisfy the substantial step or conduct element of attempt to commit assault in the first degree by proving that the defendant, while acting with the conscious objective or purpose of causing serious physical injury to the alleged victim by shooting him with a gun, engaged in conduct strongly corroborative of that criminal purpose that was at least the start of a line of conduct that would lead naturally to the commission of that crime.

Here, the state argues that the defendant attempted to commit assault in the first degree as to each of his alleged victims because, while acting with the conscious objective or purpose of causing serious physical injury to the victim, he intentionally reached for and grabbed a cocked and loaded gun in the right pocket of his shorts at the end of the second tasing cycle. The state argues that this conduct, coming in the course of the defendant's prolonged physical resistance to the officers' efforts to subdue him, was strongly corroborative of his intent to secure the gun and use it against each of the officers in order to avoid being taken into their custody and control.

The defendant disputes the state's contention on several grounds, noting initially that the defendant never threatened to shoot or kill any of the officers, never pointed the gun at any of them, and, of course, never fired a shot. Recognizing, however, that a defendant's intent or purpose is usually proven by inference and that the state here sought to prove his intent to inflict serious physical injury upon the officers with a gun in reliance upon other aspects of his alleged conduct during his encounter with them, he focuses his attack on what he claims to be two critical weaknesses in the state's evidence against him. First, he claims that none

of his proven conduct can be found to have been intentional because it was immediately preceded by painful and debilitating tasing, which assertedly disabled him from engaging in deliberate physical movement. Second, he claims that, even if his physical movements at the time of his alleged conduct could have been found to be deliberate, there are irreconcilable inconsistencies between the officers' trial testimony about his encounter with them and the actual manner in which that encounter took place, as recorded by the camera on Larregui's Taser gun. The defendant contends that the recording so clearly undermines the essential basis for the state's attempt charges against him as to require the reversal of his conviction of those charges. We do not agree with either of the defendant's contentions.

It is appropriate at the outset to observe both that the theoretical basis of the state's underlying claim of criminal culpability against the defendant is legally sound and that the testimony of the three officers, if considered in the light most favorable to the state in support of that theory, is sufficient on its face to sustain the jury's guilty verdict on all three counts of attempt to commit assault in the first degree. The ultimate measure of the sufficiency of the defendant's conduct to constitute a substantial step in a course of conduct planned to culminate in the commission of assault in the first degree is not, to reiterate, how close in time or place or final execution his proven conduct came to the consummation of that crime, but whether such conduct, if at least the start of a line of conduct leading naturally to the commission of the crime, strongly corroborated his alleged criminal purpose. The defendant's act of reaching quickly into his pocket and grabbing a cocked and loaded gun while struggling with uniformed police officers who were attempting physically and by verbal command to subdue him reasonably could have been found not only to have been the start of a line of

conduct leading naturally to securing the gun and using it to shoot and cause serious physical injury to each of the three officers, but also to have been strongly corroborative of his alleged purpose to engage in such conduct and cause such results, and thus to commit assault in the first degree against each officer.

The jury also reasonably could have found that the defendant gave the officers stubborn physical resistance from the beginning of the incident until the end; that, although the defendant was being tased, and thus was incapable of voluntary physical movement until just before he reached for his gun, he was restored to full strength and function, with the capacity to engage in deliberate physical movement, as soon as each tasing cycle ended; and that, when the second tasing cycle ended, he immediately reached downward with his right hand to the right front pocket of his shorts, from which he grabbed and partially removed his cocked and loaded gun. Unless the evidence adduced at trial was such as necessarily to raise a reasonable doubt about any of these central aspects of the officers' testimony, the defendant's challenge to the sufficiency of the evidence to support his conviction of three counts of attempt to commit assault in the first degree must be rejected.

The defendant does not claim that he did not struggle with the three officers while they attempted to subdue him. The most he claims on that subject is that once he was tased, he lost all capacity to engage in deliberate physical movement. He claims, on that basis, that his alleged conduct of reaching toward his shorts pocket at the end of the second tasing cycle cannot be found to have been an intentional act, since he was still under the influence of the shock from the Taser at that time.

Other than the officers' testimony and the video of the incident, no evidence was presented at trial as to the effects of a Taser gun on a target's capacity for

deliberate bodily movement. The officers explained that, although the target of a Taser is totally incapacitated while the Taser is deployed, he is restored to full function, and thus able to act deliberately, as soon as the tasing stops. If the jury accepted this testimony, as was their prerogative, the defendant reasonably could have been found to have acted deliberately when, as the officers testified, he reached for and grabbed the cocked and loaded pistol in his pocket between tasing cycles.

Even, however, if the evidence permitted the jury to find that the defendant was capable of engaging in deliberate physical movement at the time he is alleged to have reached for and grabbed the gun in his pocket, the defendant insists that the video of the incident definitively raises a reasonable doubt as to whether he actually grabbed the gun or pulled it from his pocket at that time, and thus that the state's evidence against him is fatally undermined. With this claim in mind, we turn to the video, which was played during trial and intermittently paused so that each officer could describe the events depicted therein.

According to the defendant, "[t]he video establishes that the events occurred as follows: When the second [Taser] charge stopped at 00:28, the defendant's hand had not come in contact with the gun, nor had his hand come in contact with the pocket containing the gun. At 00:28, the defendant had experienced nearly 11 straight seconds of intense pain, incapacitation and electrocution-like effects from the Taser. At 00:28, the defendant's right hand can be seen near his pants pocket which contained the gun. The defendant did not touch the gun or pull it out of his pocket. At 00:29, the view of the defendant's pocket is blocked for a fraction of a second and then (also at 00:29) when the pocket becomes visible again, we can see the defendant's arm stretched out away from his body and the pocket. At

00:30, the video shows Larregui's leg and foot in between the defendant's arm and his body.[3] At 00:30 to 00:31, the gun comes out of or falls from the defendant's pocket on its own. At this time the defendant's arm is still outstretched and not near his pocket or the gun. At 00:30 of the video, someone other than the defendant is heard saying to get the 'fucking gun out of that pocket.' The clicking from the Taser can be heard at the very end of the 00:31 mark, meaning Larregui has begun to [tase] the defendant for the third time. When the [tasing] starts, the defendant does not have, nor could he have, the gun. Thereafter, while the camera is pointed at the ground and the defendant is yelling in pain, someone other than the defendant says, 'I got the gun' immediately before the gun discharges at 00:35. Confirming that someone other than the defendant picked up the gun and dropped it, a voice that is not the defendant's is heard at 01:30 of the video saying, 'Dude, I went to go grab it and it went right off. . . . It bounced right off the ground."

If the jury saw and understood the video exactly as the defendant has described it, it might well have had questions about certain aspects of the officers' trial testimony. The most significant of those questions might have concerned the defendant's claim that the video fails to show his hand ever reaching into his pocket and grabbing a gun therefrom. The defendant would have us rely upon his description of the incident, as assertedly shown in the video, to discredit the officers' testimony in its entirety. We reject this claim for two reasons. First, any alleged inconsistencies between the officers' testimony and the video would not have required the jury to discount all of the officers' testimony. It is axiomatic that "it is the jury's role as the

---

[3] We note that the testimony at trial indicated that it was Vasquez, not Larregui, who stepped between the defendant's arm and his body. This inconsistency is immaterial in light of the active role of each of the officers in attempting to subdue the defendant.

sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. . . . It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness . . . and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 802, 877 A.2d 739 (2005). The jury could have discounted those portions of the officers' testimony that were inconsistent with the video and credited the remainder.

Second, the jury reasonably could have determined that the video does not necessarily raise reasonable doubt as to whether the defendant reached into his pocket and grabbed his gun after the second tasing cycle. The jury reasonably could have found that the video shows the defendant reaching toward his pocket and then a silver gun appearing at or near the pocket before falling to the ground beneath him. Viewing the video's contents in this manner, the jury might reasonably have found that the reason the gun appeared at or near the defendant's pocket immediately after he reached for it is that, in fact, he intentionally grabbed it, and thereby dislodged it, causing it to fall. On that basis, the jury reasonably could have found that the defendant took a substantial step in a course of conduct planned to culminate in the shooting of each of the officers with the gun. The evidence was thus sufficient to sustain the jury's verdict of guilty of three counts of attempt to commit assault in the first degree.[4]

[4] Following oral argument, we asked the parties to submit supplemental briefs addressing the unpreserved issue of whether, if the state's evidence was found sufficient to support the jury's guilty verdict of three counts of attempt to commit assault in the first degree, the defendant's conviction of three separate counts of that offense should be upheld, or, instead, should be merged into a conviction of one count of attempt to commit assault in the first degree for which a single sentence should be imposed. In *State* v. *Montgomery*, 22 Conn. App. 340, 578 A.2d 130, cert. denied, 216 Conn. 813, 580 A.2d 64 (1990), this court affirmed a conviction of multiple counts of attempt to commit assault in the first degree against different intended

## II

The defendant also claims that the court erred in failing to allow the jury to take the video of the events at issue, which had been introduced as an exhibit, into the deliberating room, requiring them instead to view the video in the courtroom, in the presence of the court, counsel and all others attending the trial. The following additional facts are relevant to this claim.

After commencing its deliberations, the jury sent a note to the court asking to have the video replayed for it, first at full speed and then at one-half speed. In response to this request, the jury was returned to the courtroom, where the recording was first played in its entirety at full speed, then played at half speed to the point when the foreperson interrupted as follows: "Your Honor, we don't need to see any more of the video,

victims based upon a single course of conduct found to have strongly corroborated the defendant's alleged purpose of inflicting serious physical injury upon each such victim by means of a deadly weapon. The court in *Montgomery* explained: "A fundamental purpose of the criminal law is to protect individual citizens from the criminal conduct of another. People are neither fungible nor amorphous. Where crimes against persons are involved, a separate interest of society has been invaded for each violation. Therefore, when two or more persons are the victims of a single episode there are as many offenses as there are victims." (Internal quotation marks omitted.) Id., 350. That is, the defendant can appropriately be convicted of attempt to commit assault in the first degree with respect to any alleged victim as to whom the state proves beyond a reasonable doubt that, while acting with the intent to cause serious physical injury to that victim with a deadly weapon or a dangerous instrument, he engaged in conduct constituting a substantial step in a course of conduct planned to culminate in the commission of that offense against that victim. Here, because the jury reasonably could have found that the defendant, while physically struggling with all three officers at close range throughout their concerted efforts to subdue him, reached quickly into his shorts pocket and dislodged therefrom a cocked and fully loaded five shot revolver, we conclude that the jury reasonably could have found that such conduct strongly corroborated the defendant's alleged intent to use the gun to shoot each of the three officers in an attempt to overcome the officers' efforts to subdue him and to escape from their custody and control. For that reason, we affirm the defendant's conviction of each of the three counts of attempt to commit assault in the first degree.

actually we're going to go back in our room and discuss some of the other areas that we'd like to have replayed on the video." The jury then exited the courtroom and resumed its deliberations. Thereafter, the jury sent the court another note, asking to view the video "in private." Before the jury was brought into the courtroom for the court's response, the court informed counsel that, pursuant to *State* v. *Gould*, 241 Conn. 1, 15, 695 A.2d 1022 (1997), the video must be viewed "in open court under the supervision of the trial judge, in the presence of the parties and their counsel."[5] With no objection by the state or the defense to this procedure, the court summoned the jury and informed them that it could not grant their request. The foreperson responded that the jury would "be asking for [the video] to be replayed multiple times," then specifically stated that the jury would like to see the first twenty seconds of the video, played at regular speed. After the court complied with that request, the foreperson immediately asked to see it again in slow motion. The court told the jury that it could see the video as many times as it would like, then complied with its request. The foreperson next asked the court to see the portion of the video from the fifteen second mark to the thirty-five second mark, at regular speed. Due to technical difficulties, however, the court and the parties discovered that the video could only be replayed from the beginning. So informed, the foreperson next requested a playback from the start of the recording to the thirty-five second mark. The court complied with that request and asked if the jury wanted to see it again. After the foreperson responded in the affirmative, the video was played three more times

---

[5] We note that *Gould*, the case upon which the court relied in denying the jury's request to view the video in the deliberating room, concerned videotaped deposition testimony, not a trial exhibit like the video in this case. See *State* v. *Gould*, supra, 241 Conn. 9–15. We need not address the propriety of the court's reliance on *Gould* because no objection to that aspect of the court's ruling was preserved for our review.

before the jury returned to the deliberating room.
Shortly thereafter, the jury asked for certain parts of
the video to be played back and asked if the first sixty
seconds could be isolated and "played in a loop." The
court then adjourned for the day. The next morning,
the court played the requested loop for the jury, first
at regular speed, then again at one-quarter speed, then
one more time at regular speed. The jury deliberated
further and then sent several additional requests to the
court, including a request to view the video from the
twenty-five second mark to the thirty-five second mark.
The video was played for the jury as requested, frame
by frame, beginning at the twenty-three second mark
until thirty seconds. The foreperson then asked to "go
back frames," specifically to the frames at the twenty-
seven second to twenty-nine second marks. The frames
were played back as requested. The foreperson then
asked to "go back one," and that request was again
complied with. The video was then played again as
requested by the jury and, at one point, the foreperson
asked for the replay to stop so that a snapshot of a
particular frame could be made, marked as an exhibit
and provided to the jury. The court and counsel agreed
that the video was the exhibit that had been introduced
into evidence at trial, and that the admission of addi-
tional evidence at that point in the trial would be
improper. The foreperson further asked if the contrast
in the video could be adjusted, but the court indicated
that it could not be, because that would alter the evi-
dence that had been admitted. The foreperson then
asked that the next frame be replayed and the video
was played as requested. Thereafter, the jury returned
to the deliberating room to resume its deliberations.
The jury did not ask to see the video again.

At no time did the defendant ask that the jury be
allowed to view the video in the deliberating room, nor
did he take issue with the court's denial of the jury's

request to do so. Consequently, the defendant concedes, as he must, that he did not preserve the present claim at trial. He nonetheless maintains that his claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as constitutional error, and under the plain error doctrine. We disagree.

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. We consistently have held that purely evidentiary claims fail the second prong of *Golding* as they are not of constitutional magnitude. See *State* v. *Wells*, 111 Conn. App. 84, 90, 957 A.2d 557 ("[t]he defendant can not raise a constitutional claim by attaching a constitutional label to a purely evidentiary claim or by asserting merely that a strained connection exists between the evidentiary claim and a fundamental constitutional right" [internal quotation marks omitted]), cert. denied, 289 Conn. 958, 961 A.2d 423 (2008).

Here, although the defendant's claim is not a classic evidentiary claim, in that it does not challenge the admission or exclusion of evidence or limitations upon the uses to which admitted evidence lawfully could be put, it concerns the process by which admitted evidence was made available to the jury for its review and consideration in the course of deliberations. Addressed, as it is, to a practical issue of trial management, it does not concern whether the jury had unrestricted access to

duly admitted evidence or an unencumbered opportunity to deliberate about such evidence in complete privacy, but how the passive viewing of certain trial evidence was facilitated during deliberations. The jurors were not required by the court's challenged ruling to discuss the video evidence in the presence of the court and counsel or otherwise to discuss the case or deliberate in public. They were not limited in their access to the evidence, either by express order or by implicit judicial suggestion. Rather, they were invited to return to the courtroom as often as they wished to view and review the video, shown and reshown, in several different ways. We thus conclude that the claim fails under the second prong of *Golding*.[6]

The defendant also asserts that his unpreserved claim should be reviewed under the plain error doctrine. See Practice Book § 60-5. We disagree. Our Supreme Court has explained: "The plain error doctrine is a rule of reversibility reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear

---

[6] Even assuming, arguendo, that the defendant's claim in this regard could be construed as one of constitutional magnitude alleging the violation of his fundamental right to due process, we could not conclude that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial because the jury watched the video repeatedly and the defendant has not proved that he was deprived of a fair trial on the basis that the jury was required to view the video in the courtroom instead of the deliberating room. The defendant's claim thus would also fail under the third prong of *Golding*.

and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Roger B.*, 297 Conn. 607, 618, 999 A.2d 752 (2010).

On the basis of our review of the record, we cannot conclude that the court's ruling requiring the jury to view the video in the courtroom constituted a manifest injustice. There is nothing in the record to suggest that the jury felt constrained in the manner in which it reviewed the video. Although the defendant contends that the "jury was unable to adequately view and consider a key piece of evidence in the trial," his claim is belied by the fact that the jury viewed the video, or portions of it, no fewer than twelve times throughout its deliberations, often asking that specific portions be played and at various speeds. There is no indication in the record that the jury was exposed to any undue influence as a result of being required to view the video in the courtroom. The defendant has failed to demonstrate that the court's denial of the jury's request to view the video in the deliberating room constituted an obvious error that affected the integrity of the trial. Therefore, the defendant's attempt to invoke the plain error doctrine in this case must fail.[7]

### III

The defendant finally claims that the court erred in failing to instruct the jury as to the intent element of the charge of interfering with a peace officer. The defendant acknowledges that he did not preserve this claim of instructional error at trial, and thus he seeks review of the claim under *State* v. *Golding*, supra, 213 Conn. 239–40. Although the defendant's claim is reviewable

---

[7] The defendant also suggests that the court's error in this regard constituted a structural defect rendering the trial fundamentally unfair. Because we address this issue in our plain error analysis, we decline to analyze it further under a different guise.

under *Golding* because the record is adequate to review the court's instructions and a claim that the court omitted an instruction concerning an essential element of the crime is of constitutional dimension, it is well settled that waived claims cannot satisfy *Golding*'s third prong. See, e.g., *State* v. *Darryl W.*, 303 Conn. 353, 367–68, 33 A.3d 239 (2012). We conclude that this claim has been waived.

The following additional facts are relevant to the defendant's claim of instructional error. On the morning of the last day of evidence, defense counsel informed the court that his next witness would not be available to testify until 2 p.m. that afternoon. The court dismissed the jury until that time and, in the interim, held a charge conference with the attorneys in this case. Although the charge conference was not held on the record, on the following morning, the court gave "an outline of what [was] covered . . . in the charge conference" and told counsel that, "[i]f there's anything you want to add or delete, please let me know." The court then briefly recited the salient points of the conference, stating, inter alia, that "[t]here will be, as part of the charge and on the interfering with an officer, the concept of excessive force . . . ."[8] Following this brief

[8] As to the content of the charge conference, the entirety of the discussion on the record was as follows:

"The Court: We discussed inconsistent statements. One inconsistent statement from Officer Csech and one from Officer Larregui. We—there were no requests for lesser included offenses. There will be, as part of the charge and on the interfering with an officer, the concept of excessive force, there will be—I'm going to allow statements concerning consciousness of guilt, one having to do with a statement and another having to do with flight. Those are to be used only on the crimes charged of pistol without a permit and criminal possession of a firearm. There—I have asked the defense whether they wanted a self-defense charge and that was—the answer I got was no, that they don't wish to have that charge. Does that—does that cover the main points of what we went over?

"[The Prosecutor]: Yes, Your Honor.

"[Defense Counsel]: Yes, Your Honor."

recitation, the court asked counsel if it had "cover[ed] the main points of what we went over," and both parties responded in the affirmative. When the court instructed the jury, it instructed on intent in general, but omitted any instruction as to the requisite intent for interfering with an officer. At the conclusion of the court's instructions to the jury, counsel for both parties indicated that they had no exceptions to the instructions as given.

Shortly after it began its deliberations, the jury asked the court to repeat its instruction on the interfering charge. Neither party expressed any objection to the repeated instruction as given. At the beginning of its second full day of deliberations, the jury again asked the court to repeat its instruction on interfering with an officer. The court repeated its previous instruction to the jury. After the court read the instruction, neither party raised an issue with that instruction. Defense counsel then asked to approach the bench and a brief side bar ensued, after which the court excused the jury to resume its deliberations. After the jury exited the courtroom, the court indicated: "Counsel has suggested that maybe that definition of interfering with an officer be typed up." The court asked if both the state and defense joined in that suggestion. Thereafter, the court monitor transcribed the court's repeated instruction on the interfering charge. The court again asked if both counsel agreed that the transcript could be given to the jury and both responded in the affirmative. The state asked the court to review the transcript of the instruction for accuracy before it was submitted to the jury. Neither party asked to review the transcript. The transcript of the court's reinstruction was provided to the jury.

Our Supreme Court has explained: "[W]hen the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding

changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case." *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011).

Here, we conclude that defense counsel had a meaningful opportunity to review and address any deficiencies in the court's instructions, yet failed to do so. Although the record does not reflect whether the court provided counsel with a written copy of its charge before it was given to the jury, the court held a charge conference before instructing the jury and it is discernible from the record that the court's instructions to the jury were consistent with the instructions as discussed during the charge conference. The defendant did not object, nor take exception, to the court's initial instruction, or to either of the court's subsequent reiterations of that instruction; nor did the defendant object to the transcription of its instruction being provided to the jury. Because the court instructed on the interfering charge three times and then submitted a written copy of that instruction to the jury, it is reasonable to infer that defense counsel had knowledge of any potential flaws in the court's instruction, yet he failed to raise any claims regarding those flaws before the trial court. We thus conclude that defense counsel implicitly waived any objection to the instruction as given.

The judgment is affirmed.

In this opinion the other judges concurred.