******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
MARCELLUS CATCHINGS
(AC 36006)

Beach, Sheldon and Lavery, Js.*

*Argued September 19, 2016—officially released February 7, 2017*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, White, J.)

*Laila Haswell*, senior assistant public defender, for
the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with
whom were *Richard Colangelo*, state's attorney, and,
on the brief, *Paul J. Ferencek*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, Marcellus Catchings, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1).[1] On appeal, the defendant claims that there was insufficient evidence to establish beyond a reasonable doubt his intent to inflict serious physical injury on another person, as required for a conviction of attempt to commit assault in the first degree. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early morning hours of March 18, 2011, Patricia Beverly was pulling into the driveway of a pool hall in Stamford when her vehicle was struck by another vehicle. Beverly exited her car to confront the other driver, but the other driver drove off. The defendant, who was friends with the driver whose vehicle had struck Beverly's vehicle, pulled into the pool hall a couple of minutes later. The defendant was heavily intoxicated,[2] and was illegally in possession of a loaded nine millimeter semiautomatic pistol without a permit. Prior to getting out of his car, the defendant cocked his gun, not noticing that there was already a cartridge in the chamber, which caused the gun to jam and become temporarily inoperable.[3] At some point after exiting his car, the defendant began "waving" his gun around and then aimed the gun at Beverly. Beverly retreated around the corner of the building and called 911. After learning that someone had called the police, the defendant put his gun back into his waistband and called a friend to obtain a ride before the police arrived.

Officer William Garay of the Stamford Police Department responded to the scene and spotted the defendant walking down a nearby street while talking on his cell phone. Recognizing that the defendant fit the description of the person who reportedly was waving a gun, Garay exited his marked police cruiser near where the defendant was walking, shined a spotlight on the defendant, and instructed the defendant to show his hands. The defendant recognized Garay as a police officer but, because he was carrying an illegal firearm, ignored Garay's commands and continued walking. Garay drew his gun, aimed it at the defendant, and ordered him to stop and show his hands. The defendant again ignored Garay and kept walking. Garay began advancing toward the defendant with his gun drawn and shouted for the defendant to get on the ground. The defendant then broke into a run, and Garay chased after him.

At some point during the chase, Officer Luis Vidal of the Stamford Police Department arrived on the scene and attempted to block the defendant's path of escape by driving his cruiser onto the sidewalk at an angle in front of where the defendant was running. Garay, who

was positioned behind and to the left of the defendant, could not see the defendant's right hand as he ran, which was "somewhere in his stomach and waistband . . . area." Just as Vidal stopped and exited his cruiser, the defendant, while still running, suddenly removed his gun from his waistband, "turned toward his right" with the gun in his right hand, and pointed the gun directly at Garay's midsection. Garay, who was about fifteen feet away, thought that the defendant was going to shoot him, and fired a shot at the defendant that missed. As Garay fired the shot, the defendant "[a]lmost simultaneously" "dropped" his gun to the ground.

Garay dropped his gun and tackled the defendant to the ground. A violent struggle ensued. The defendant pushed Garay off him and struggled to get away, ignored Garay's repeated demands to stop resisting, and evaded Garay's attempts to handcuff him by lying on his stomach and clenching his hands beneath his chest. Vidal "jumped on" the defendant to help Garay restrain him. Officer Faruk Yilmaz of the Stamford Police Department arrived moments later and noticed the defendant's handgun, which was in a jammed and temporarily inoperable condition,[4] lying about a foot away from where the struggle was taking place. Yilmaz removed it from the area before assisting with the defendant. Eventually, the three officers subdued and arrested the defendant.[5]

The defendant was subsequently charged with multiple offenses, including attempt to commit assault in the first degree. See footnote 1 of this opinion. On March 14, 2013, the jury found the defendant guilty on all counts. The trial court thereafter rendered judgment in accordance with the verdict, and imposed a total effective sentence of fifteen years imprisonment and five years of special parole. This appeal followed.

The defendant claims that there was insufficient evidence to convict him of attempt to commit assault in the first degree because no reasonable jury could have concluded beyond a reasonable doubt that he intended to inflict serious physical injury on Garay. In support of this claim, the defendant argues that "[t]he simple act of pointing a gun, without any accompanying assertive behavior that could permit an inference of specific intent to seriously injure [Garay] by shooting him, is too equivocal an act to prove intent." In response, the state contends that it introduced additional evidence, beyond the defendant's mere act of pointing the gun at Garay, to establish the defendant's intent, including the defendant's conduct prior to the encounter with Garay and the fact that the defendant raised his gun at Garay while attempting to resist arrest. We agree with the state.[6]

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine

whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 656–57, 1 A.3d 1051 (2010).

Turning to the relevant statutory provisions, § 53a-49 (a) provides in relevant part that "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does . . . anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Section 53a-59 (a) provides in relevant part that "[a] person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon . . . ."

Thus, "[i]n order to sustain a conviction for attempt to commit assault in the first degree, the state must have presented evidence from which the jury reasonably could have found beyond a reasonable doubt that the defendant did something constituting a substantial step in a course of conduct planned to culminate in his commission of the crime . . . namely, assault with the intent to cause serious physical injury to another person . . . . Regarding the substantial step requirement, we have held that [a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the

substantive crime . . . . In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute. . . .

"Regarding the intent requirement, an individual acts intentionally with respect to a result or to conduct . . . when his conscious objective is to cause such result or to engage in such conduct . . . . Intent may be, and usually is, inferred from [a] defendant's verbal or physical conduct [as well as] the surrounding circumstances. . . . Nonetheless, [t]here is no distinction between circumstantial and direct evidence so far as probative force is concerned. . . . Moreover, [i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . Finally, we underscore that intent [can] be formed instantaneously and [does] not require any specific period of time for thought or premeditation for its formation. . . . Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Citations omitted; internal quotation marks omitted.) *State* v. *Carter*, 317 Conn. 845, 856–57, 120 A.3d 1229 (2015).

Our resolution of the defendant's sufficiency of the evidence claim must begin with a review of *Carter*, in which our Supreme Court rejected a sufficiency claim premised on the argument that the mere act of pointing a gun at someone is insufficient to establish intent. Id., 857. In *Carter*, several uniformed police officers approached the defendant in a bar after learning that he had threatened to " 'pop this white dude.' " Id., 848. The defendant turned, removed a handgun from his pocket, and pointed it at one of the officers' midsection. Id., 849. The officer and the defendant pointed their guns at each other for a few seconds, with neither attempting to shoot, until the defendant lowered his gun and turned the other way. Id., 850. The defendant began struggling with the officers who attempted to handcuff him before eventually surrendering at gunpoint. Id.

The defendant was convicted of, inter alia, attempt to commit assault in the first degree and claimed, on appeal, that there was insufficient evidence to establish his intent to inflict serious physical injury on the officer at whom he pointed his gun. Id., 851–52. In rejecting that claim, our Supreme Court relied on the fact that the defendant aimed specifically at the officer's midsection, an area of her body particularly susceptible to substantial physical injury; id., 858; that the defendant placed his finger on the trigger guard, "one of the last steps that an individual must take before firing a gun";

id.; that the defendant, after aiming the gun, "positioned himself in a shooting stance" and "maintained that position for approximately five seconds despite repeated orders to drop the gun"; id.; and that the officer was "so sure the defendant was going to shoot her" that she began to remove the safety mechanism on her own gun. Id. The court also noted that, after the officers closed in on the defendant, "he attempted to maintain possession of his gun rather than acquiesce," and that "it would not have been unreasonable [given his earlier actions] for the jury to infer that he was attempting to maintain possession of the gun to use it." Id. Finally, the court observed that, approximately one hour before the standoff, the defendant "had expressed an intention and willingness to use the gun by threatening to shoot a particular 'white dude.' " Id., 859.

In addition to the factors bearing on the court's decision in *Carter*, this court recognized in *State* v. *Osbourne*, 138 Conn. App. 518, 530–31, 53 A.3d 284, cert. denied, 307 Conn. 937, 56 A.3d 716 (2012), that a sudden movement to procure a loaded firearm, when made in the course of an attempt to arrest, is especially indicative of an intent to use the firearm to shoot and cause serious physical injury to the pursuing officer. The defendant in *Osbourne*, after attempting to flee from police officers who approached him on the street, began violently resisting the officers' attempts to physically subdue him, prompting one of the officers to utilize his Taser gun. Id., 522–23. After the second tasing cycle, the defendant quickly reached into his pocket and partially removed a loaded handgun, at which point the officers immediately intervened, removed the gun from the defendant's possession, and handcuffed him. Id., 523. Rejecting the defendant's claim on appeal that there was insufficient evidence of his intent, this court concluded that "[t]he defendant's act of reaching quickly into his pocket and grabbing a cocked and loaded gun while struggling with uniformed police officers who were attempting physically and by verbal command to subdue him reasonably could have been found not only to have been the start of a line of conduct leading naturally to securing the gun and using it to shoot and cause serious physical injury to each of the three officers, but also to have been strongly corroborative of his alleged purpose to engage in such conduct and cause such results, and thus to commit assault in the first degree against each officer." Id., 530–31.

In the present case, on the basis of the evidence adduced at trial, the jury reasonably could have concluded that the defendant intended to shoot and cause serious physical injury to Garay. Leading up to the encounter, the defendant, who knew that the police were searching for him because he had brandished his gun at Beverly, recognized Garay to be a police officer. In order to avoid being arrested and prosecuted for carrying a firearm without a permit, the defendant

ignored Garay's orders to show his hands. When Garay raised his gun and ordered the defendant to get on the ground, the defendant ran. After a brief chase, the defendant, while running full speed, abruptly removed his gun from his waistband, turned his body partially around toward Garay, and pointed his gun directly at Garay's midsection from fifteen feet away. Therefore, contrary to the defendant's contention, the evidence at trial demonstrated not only that the defendant pointed his gun at Garay, but that he did so in an abrupt and purposeful manner while engaged in a prolonged effort to resist being arrested and charged with unlawful possession of a firearm. Viewing the defendant's actions in context with these surrounding circumstances, the jury reasonably could have inferred that the defendant, in order to effectuate his escape, pointed his gun at Garay with the intent to shoot him in the midsection, "an area of [his] body that would be likely to inflict physical injury which creates a substantial risk of death . . . ." (Internal quotation marks omitted.) *State* v. *Carter*, supra, 317 Conn. 858; see *Godsey* v. *State*, 719 S.W.2d 578, 583 (Tex. Crim. App. 1986) (finding sufficient evidence of intent to kill where defendant deliberately removed handgun from waistband after seeing police officers, ignored orders to drop gun, and then pointed gun directly at officers).[7]

Furthermore, Garay testified that when the defendant turned and pointed the gun at him, he fired a shot at the defendant because he thought the defendant was going to shoot him. As Garay fired, the defendant "[a]lmost simultaneously" "dropped" his gun to the ground. The defendant was tackled by Garay immediately thereafter, and although he continued to resist, he was ultimately handcuffed and subdued by the three officers. The jury reasonably could have inferred from this evidence that the defendant turned and pointed his gun at Garay with the intent to shoot him, but was interrupted from taking a further step toward that desired result by Garay, who forced the defendant to drop his weapon by firing at him. See *State* v. *Pinnock*, 220 Conn. 765, 775, 601 A.2d 521 (1992) ("[t]he attempt is complete and punishable, when an act is done with intent to commit the crime . . . whether the purpose fails by reason of interruption or for other extrinsic cause" [internal quotation marks omitted]). Even if, however, the defendant relinquished his intention to shoot Garay when he dropped the gun, "that change would not negate his earlier intention, and the brevity of that intent is irrelevant." *State* v. *Carter*, supra, 317 Conn. 858.

The defendant's conduct prior to the encounter with Garay further supports the jury's finding that the defendant harbored the requisite intent to shoot and cause serious physical injury to Garay. See *State* v. *Commerford*, 30 Conn. App. 26, 34, 618 A.2d 574 (intent to commit assault can be inferred from "events leading

up to and immediately following the incident" [internal quotation marks omitted]), cert. denied, 225 Conn. 903, 621 A.2d 285 (1993). The defendant admitted at trial that, prior to his confrontation with Beverly, he cocked his gun in order to load a cartridge into the chamber despite the fact that the gun was already loaded. The jury reasonably could have inferred from this evidence that the defendant wanted to ensure that the gun was ready to fire, and therefore that he possessed a willingness, if not a specific intention, to fire the gun. Although the defendant presumably did not engage in this preparatory act in anticipation of an encounter with police, it is nevertheless probative of his state of mind. See *State* v. *Carter*, supra, 317 Conn. 859 (relying in part on fact that "one hour before the defendant's standoff with [the officer], the defendant had expressed an intention and willingness to use the gun by threatening to shoot a particular '[dude],' " despite fact that threat was not directed at officer). We conclude that the evidence of this prior conduct, coupled with the circumstances surrounding the defendant's encounter with Garay, provided sufficient evidence to support a reasonable jury's finding of intent to inflict serious physical injury beyond a reasonable doubt.

The defendant nevertheless argues that the evidence was insufficient to support the jury's finding of intent. Neither of his two primary arguments in this regard are availing. First, he argues that there is no evidence that he placed his finger on the trigger[8] or fired the gun after pointing it at Garay. The absence of those facts, however, does not preclude the jury's finding of intent to inflict serious physical injury. "Although the actual firing of a gun provides strong evidence of intent, the absence of such evidence does not automatically render the evidence insufficient . . . . As we have previously noted, [i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt . . . ." (Internal quotation marks omitted.) Id., 860; see also *State* v. *Osbourne*, supra, 138 Conn. App. 531 (affirming jury's finding of intent on basis of evidence that defendant partially removed gun from pocket). Those principles apply with particular force in the present case because, as previously explained, the jury reasonably could have concluded that "it was only the show of overwhelming force [by police] that persuaded the defendant to relinquish [his] intent." *State* v. *Carter*, supra, 317 Conn. 859.

In any case, whether or not the defendant discharged the gun or placed his finger on the trigger misses the point. To be guilty of criminal attempt, the defendant need only take a "substantial step" in a course of conduct planned to culminate in the commission of the crime; see General Statutes § 53a-49 (a) (2); and, in determining whether the defendant took the necessary substantial step, the focus is "on what the [defendant] has already done and not what remains to be done."

(Internal quotation marks omitted.) *State* v. *Daniel B.*, 164 Conn. App. 318, 331, 137 A.3d 837, cert. granted, 323 Conn. 910, A.3d (2016). Because the jury reasonably could have found that the defendant engaged in the substantial step of pointing his gun at Garay; see *State* v. *Cox*, 293 Conn. 234, 246 n.9, 977 A.2d 614 (2009); and that he did so with the intent to inflict serious physical injury, he is guilty of attempt to commit assault in the first degree regardless of whether he subsequently placed his finger on the trigger or fired the gun.[9] See *State* v. *Carter*, supra, 317 Conn. 861 ("defendant's claim that he did not rack the gun, even if true, would only support the proposition that he did not take the *next* step to complete the crime, which, of course, is irrelevant to the inquiry whether he took a *prior* substantial step to commit the offense" [emphasis in original]).

Second, the defendant argues that he could not have formed the intent to inflict serious physical injury because, at the time of his confrontation with Garay, his gun was jammed and thus would not have fired even if he had pulled the trigger. We disagree. The attempt statute merely requires the state to prove that the defendant took a substantial step "under the circumstances as he believe[d] them to be . . . ." General Statutes § 53a-49 (a) (2). That statutory language "sweeps aside any consideration of the defense of impossibility, including the distinction between so-called factual and legal impossibility. Under [§ 53a-49 (a) (2)], the liability of the actor turns on his purpose, considered in the light of his beliefs, and not on what is actually possible under existing circumstances. If the actor attempted to pick an empty pocket of another person mistakenly thinking it contained money, he would be guilty of attempted larceny." D. Borden & L. Orland, 10 Connecticut Practice Series: Connecticut Criminal Law (2d Ed. 2007) p. 115. In view of that principle, the existence of the jam in the present case does not bear on the jury's determination that the defendant was guilty of attempt to commit assault in the first degree if the defendant believed the gun to be operable and ready to fire when he pointed it at Garay. See *State* v. *Carter*, supra, 317 Conn. 861 (fact that gun was not racked and thus incapable of firing did not negate intent element because "it [was] . . . entirely reasonable for [the jury] to infer that the defendant did not know that it was necessary to rack the gun" in order to fire it).

Our review of the record discloses ample evidence from which the jury reasonably could have concluded that the defendant was unaware that his gun was inoperable when he raised it at Garay. First, the state presented evidence that the defendant was intoxicated around the time of the events in question; see footnote 2 of this opinion; from which the jury reasonably could have inferred that the defendant failed to notice that he had caused the gun to jam by cocking it when there

was already a cartridge in the chamber. Although the defendant argues that the jam was readily apparent because it caused the barrel of the gun to protrude outward, it was not unreasonable for the jury to have concluded that, given his intoxication, the defendant failed to notice the jam. Moreover, the defendant did not mention the jam in the sworn, written statement that he provided to the police the day after his arrest.[10] In the statement, the defendant claimed, untruthfully, that prior to confronting Beverly he "made sure that [his gun] was on safety and that there [were] no bullets in the chamber." The defendant further claimed that while running from the scene he attempted to throw his gun over an adjacent fence and, contrary to his testimony at trial, that he did not realize that a police officer was chasing him. Despite the defendant's apparent willingness to downplay certain facts to the police in order to portray himself in a more favorable light, he did not mention the fact that the gun was jammed or make any suggestion that he believed that the gun was inoperable. On the basis of this evidence, it was entirely reasonable for the jury to have discounted the defendant's testimony at trial that he was aware of the jam prior to his encounter with Garay. See *State* v. *Gary*, 273 Conn. 393, 406, 869 A.2d 1236 (2005) ("[T]he [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence . . . . [P]roof beyond a reasonable doubt [does not] require acceptance of every hypothesis of innocence posed by the defendant . . . ." [Internal quotation marks omitted.]). The jury reasonably could have determined that the defendant was unaware of the jam, and therefore believed the gun to be fully operable and ready to fire when he pointed it at Garay. Accordingly, the existence of the jam does not negate the jury's finding of intent to inflict serious physical injury.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The defendant also was convicted of assault of a peace officer in violation of General Statutes § 53a-167c (a) (1), and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a). Those convictions are not at issue in this appeal.

[2] Sometime later, after the defendant was arrested, he submitted to a blood test that determined his blood alcohol content to be 0.272, a "high" alcohol content, albeit "not lethally so." At trial, the defendant, who testified in his own defense, admitted that he drank a pint of Hennessy about thirty minutes prior to the events in question.

[3] By cocking the gun while there was already a cartridge in the chamber, the defendant forced a second cartridge into the chamber which caused the jam. Although the gun could not be fired in that condition, the defendant could have fixed the jam in a matter of seconds simply by pulling back on the slide and releasing the two cartridges from the chamber.

[4] The state conceded at trial that when the defendant pointed the gun at Garay, the gun "was jammed" and "was not going to fire."

[5] The defendant, Garay, and Vidal all sustained injuries in the struggle. Immediately after the incident, the defendant was taken to Stamford Hospital for treatment where he presented with abrasions on his hand, swollen lips,

and a laceration in his mouth. Garay sprained his left shoulder and sustained bruises and cuts on his right hand. Vidal sustained a contusion to his right hand.

[6] It remains an open question in Connecticut "whether the mere act of pointing a gun at someone is sufficient to establish intent to inflict serious physical injury beyond a reasonable doubt . . . ." *State* v. *Carter*, 317 Conn. 845, 857, 120 A.3d 1229 (2015). Because, contrary to the defendant's argument, this case does not merely involve the isolated act of pointing a gun at someone, we need not resolve that issue in the present case.

[7] In *Godsey* v. *State*, supra, 719 S.W.2d 578, a decision our Supreme Court has cited with approval; see *State* v. *Carter*, supra, 317 Conn. 860; the defendant, after seeing multiple uniformed officers with their guns pointed at him, deliberately removed a loaded handgun from his waistband, ignored the officers' commands to drop the gun and put his hands on his head, and pointed the gun at the officers as if he were aiming. *Godsey* v. *State*, supra, 583. In finding that there was sufficient evidence of the defendant's intent to kill, the court observed that "[w]e are not holding that the pointing of the loaded gun, in and of itself, is sufficient. Rather, the context of the offense, the way in which the pointing came about [and] the facts and circumstances of the offense, prove the intent." Id. The court noted the specific manner in which the defendant exhibited the gun, explaining that the defendant "was not merely waving the gun around," but "deliberately pulled it out . . . after seeing the armed officers with their guns pointed at him" and proceeded to "point the gun in such a way that it was almost as if he were 'drawing a bead' on [two of the officers]." Id. Finally, the court relied on the evidence of the defendant's "suicide wishes," which, it reasoned, supported the inference that the defendant "could have decided to shoot the officers so that they would then shoot him." Id.

[8] After the defendant's arrest, police examined his gun and discovered his fingerprints on the magazine and his DNA on the slide. Trace evidence on the trigger, however, was insufficient for a DNA comparison.

[9] The defendant relies on *State* v. *Dunn*, 26 Conn. App. 114, 124, 598 A.2d 658 (1991), in which this court stated that "it would have been *permissible* to infer that the defendant did not intend to cause serious injury to [the victim] from the fact that he did not shoot [the victim] despite the opportunity and means to do so . . . ." (Emphasis added.) Id., 124. That observation, however, was made in the context of whether there was evidence of the defendant's intent to inflict an injury *that was serious in nature*, and is therefore inapposite in the present case, which concerns the distinct issue of whether there was evidence of the defendant's intent to shoot Garay. See *State* v. *Carter*, supra, 317 Conn. 861–62 (distinguishing *Dunn*). Moreover, although it may in theory be permissible for a jury to infer a lack of intent where the defendant does not fire the gun, the jury was not required to draw that inference under the circumstances of the present case. To suggest otherwise misunderstands our standard of review for sufficiency of the evidence claims. See *State* v. *Hedge*, supra, 297 Conn. 657 ("On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." [Internal quotation marks omitted.]).

[10] The entirety of the defendant's statement, which he provided to multiple officers of the Stamford Police Department after executing a written waiver of his rights, reads as follows: "My name is Marcellus D. Catchings and I'm 24 years old. My date of birth is 8/6/86. I live at 47 Hastings St, Bridgeport, CT and I have lived there for about five to six months. I'm currently unemployed. I give this voluntary sworn statement to Officer A. Gonzalez and Officer Rodriguez.

"On Thursday, March 17, 2011 at about 7:30 PM I was at a basketball game at AIT, (High Ridge Road), and after the game I went to my grandmother's, (Jeanette Catchings), house at 46 Durant Street. I left my grandmothers house with Tamika Collighan who picked me up in her car and we went to [Banks] Pool Hall in the south end. We got there around eleven something.

"In the parking lot of [Banks] someone gave me a drink of Vodka with juice. I then got a pint of Hennessey from [Banks] and went outside and started talking with everyone. There was about nine or more people outside. It took me about 20-30 minutes to finish the Hennessy. I saw some girls who came there and started fighting with a girl that I was talking with, (Danielle), and I was supposed to leave with on that night.

"I pulled a gun out from my waist and I made sure that it was on safety and that there was no bullets in the chamber. I was telling everyone to stop

fighting. The gun I had I was pointing it towards the sky. It was a 9MM. People started running and I guess someone had called the cops. I [saw] one cop car coming so I ran.

"While I was running I saw a cop car in front of me and I threw the gun which I had [in] my hand. I tried to throw it over the fence but I heard it hit the fence and fall on the ground. I ended up on the ground and then the cops started kicking me and all I remember is being in the car after that.

"I didn't point the gun at a cop because I didn't know there was a cop on foot running behind me. I thought that he was still in the car. The whole day the gun was on safety and there were no bullets in the chamber. On this date I only had those drinks I didn't do any drugs."

-----------------------------------