STATE OF NEBRASKA, APPELLEE, v. GRANT
MANCHESTER, APPELLANT.
___ N.W.2d ___

Filed March 11, 1983. No. 81-921.

Thomas M. Kenney, Douglas County Public Defender, and Bennett G. Hornstein, for appellant.

Grant Manchester, pro se.

Paul L. Douglas, Attorney General, and G. Roderic Anderson, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, and CAPORALE, JJ., and WARREN, D.J.

BOSLAUGH, J.

The defendant was convicted of attempted first

degree murder and sentenced to imprisonment for 16 to 30 years. He has appealed and assigned as error that the evidence was insufficient to support the finding of guilt; that instruction No. 10, relating to the defense of abandonment, was erroneous; and that the trial court erred in admitting into evidence tape recordings of his conversations with a witness. In a separate pro se brief the defendant contends the court lacked jurisdiction because some of the acts occurred in the State of Iowa; there was misconduct of the prosecuting attorney in his opening and closing statements; and the sentence was excessive.

The record shows that in April 1978 the defendant began having an affair with Mrs. Carolyn Rickard, who was married to Donald Rickard. In September 1979 the defendant and Mrs. Rickard went to Florida for about 3 weeks. Mrs. Rickard left a note for her husband, explaining that she was leaving to think about getting a divorce. Following her return to Omaha Mrs. Rickard told the defendant that she wanted to break off her relationship with him and go back with her husband. Mrs. Rickard testified that the defendant harassed her on several occasions after she announced her intentions, but she continued to see the defendant until January 1981, 6 months before the time of his arrest on this charge.

Donald Rickard testified that in late 1979 his wife told him of her relationship with the defendant. Rickard first encountered the defendant in a shopping center in December 1980. Rickard testified that the defendant had called him at work and had had nude pictures of Mrs. Rickard delivered to him at his place of employment. In April or May 1981 the defendant threatened Rickard with a gun while Rickard was at work; the defendant was arrested and convicted of third degree assault.

Carthell Sherrill, a cab driver for Happy Cab and a coworker of the defendant, testified that in April 1981 the defendant approached him about wanting "to give a guy a ride in a black limousine." He tes-

tified that the defendant wanted Sherrill to kill Donald Rickard, and, for insurance reasons, the defendant wanted it to look accidental.

Sherrill testified that he and the defendant discussed this matter several times a week. The initial price discussed was $800 "C.O.D." The defendant showed Sherrill the money on several occasions. The defendant and Sherrill discussed several plans concocted by the defendant for the killing. In the first, Rickard was to look like the victim of a hit and run. The next plan was to shoot Rickard while he was in his car. Another plan was to shoot him at his place of employment. The final plan was to shoot Rickard as he stood at his bedroom window.

Sherrill testified that the defendant took him on the routes Rickard used to and from work, and to his place of employment. The defendant showed Sherrill the intended victim through binoculars while Rickard was entering his workplace. The defendant also took Sherrill to Rickard's residence.

Sherrill and the defendant discussed a weapon for the killing. Sherrill told the defendant he had a .30/06 rifle, and showed it to him. The defendant discussed arranging an alibi for himself.

On June 2, 1981, Sherrill went to the police and informed them of the defendant's plan. Sherrill agreed to be outfitted with a microphone and to meet again with the defendant while under police surveillance. Sherrill, so outfitted, drove his cab out to the Omaha airport and met the defendant. The defendant had been drinking heavily that day. The defendant and Sherrill drove to a Kwik Shop in Carter Lake, Iowa, where the defendant made calls regarding the purchase of a scope for the rifle. The defendant gave Sherrill $25 for the purchase of a scope; Sherrill turned the money over to police.

At this meeting Sherrill suggested to the defendant that a third person be used for the shooting, as Sherrill's eyes were not good enough for such a distance. The defendant did not approve of another's

involvement, as he felt it was too risky. The defendant was to meet Sherrill again on the evening of June 2, but he failed to show. These conversations between the defendant and Sherrill were recorded and took place under police surveillance.

On June 3, 1981, Sherrill, again outfitted with a recording device, drove his car out to the airport. This time he brought along an undercover police officer, who was posing as a killer-for-hire. The officer had a .30/30 rifle with a scope along with him.

Sherrill met the defendant at the airport and agreed to talk with him at Kiwanis Park in Omaha. At that meeting the defendant was uncomfortable and nervous about the presence of a third person. The officer showed the defendant the gun, when the defendant finally approached Sherrill's car. Sherrill informed the defendant that they wanted partial payment up front, but the defendant insisted the deal was C.O.D. The defendant indicated that he might buy the gun. The defendant pulled out "a bunch of hundred dollar bills" and showed them to Sherrill. The defendant was then arrested and charged with attempted first degree murder. At the time of his arrest the defendant had $995 on his person, $800 of which was folded up between two pieces of paper.

The defendant maintained that any plans to kill Rickard were not seriously formulated and were devised by Sherrill. The defendant testified that Rickard was, by his wife's account, a dangerous man. The defendant felt he had been framed in a plot between Sherrill and Rickard.

The defendant contends that the evidence was insufficient to support the finding of guilt because the evidence did not show that the defendant had taken a "substantial step" toward the commission of the crime. The defendant argues that his acts amounted to "mere preparation."

Neb. Rev. Stat. § 28-201 (Reissue 1979) provides in part: "(1) A person shall be guilty of an attempt to commit a crime if he:

"(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

"(b) Intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.

"(2) When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

"(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent."

In *State v. Sodders,* 208 Neb. 504, 507, 304 N.W.2d 62, 64-65 (1981), we said: "[T]he statute [§ 28-201] requires that the dangerous disposition [of the actor] be manifested by some intentional act which would constitute a substantial step toward the completion of the crime if the circumstances were as the actor believed them to be. . . . Some examples of such conduct might be: Lying in wait for the intended victim; unlawful entry into a structure where it is contemplated that the crime will take place; possession or fabrication of the material necessary to complete the act which finally would constitute the crime; or soliciting an innocent agent to engage in conduct constituting an element of the crime."

In *Sodders, supra,* the defendant had arranged for the murder of his wife and had made a downpayment on the $5,000 price. The defendant pleaded guilty but filed a motion to vacate the judgment and sentence, arguing that § 28-201 was unconstitutionally vague. The motion was overruled and the judgment affirmed on appeal. We held the statute gave

adequate notice of the prohibited conduct and that the defendant's acts were sufficient to constitute the crime. See, also, *State v. Schmidt, ante* p. 126, 327 N.W.2d 624 (1982), in which the evidence was held sufficient to support a conviction for attempted murder.

Conduct similar to that in the present case has been held to support convictions of attempted murder. In *Duke v. State,* 340 So. 2d 727 (Miss. 1976), the defendant solicited an employee to kill his business partner. The murder was to take place on a hunting trip. That plan failed and the defendant sought to hire another killer. An FBI agent posed as the killer and collected $11,500 from the defendant after representing to the defendant that the partner was dead. This evidence was held sufficient to sustain the conviction, as the defendant's acts went far beyond mere preparation.

In *Braham v. State,* 571 P.2d 631 (Alaska 1977), the defendant and the hired killer agreed on a contract price. The defendant then arranged a situation whereby the killer could get to know the victim and enter into a relationship of trust with him. The court held this sufficient to support the conviction, as it was an unequivocal act toward the commission of a crime. See, also, Annot., 54 A.L.R.3d 612 (1974).

In the present case the defendant engaged in a series of acts directed at bringing about the murder of Rickard and corroborative of his criminal intent. The defendant made plans for the murder, solicited a killer, discussed the contract price and set the money aside in his billfold, arranged for the weapon and a scope, and showed the killer the victim, his residence, and his place of work. These acts were substantial steps which sustain the conviction.

Instruction No. 10 charged the jury that abandonment is not a defense to attempted murder, but it may be considered as bearing on the issue of criminal intent. The defendant contends the instruction was erroneous and cites the inclusion of abandon-

ment as a defense to attempt in the Model Penal Code § 5.01 (Tent. Draft No. 10, 1960) upon which the Nebraska attempt statute is patterned.

This issue was decided in *State v. Schmidt, supra.* In that case we said at 131-32, 327 N.W.2d at 627: "Schmidt further argues that even if he had committed the crime of attempted murder, the act was completely and voluntarily abandoned and therefore, under the provisions of the Model Penal Code from which our § 28-201 is patterned, the act of abandonment should be considered as an absolute defense to the instant charge. While it is true that the Model Penal Code, which was used as a guideline by the Legislature when it adopted § 28-201, does contain the defense of abandonment in § 5.01(4) (Tent. Draft No. 10, 1960), it is further true that the defense was not included in the act when adopted by the Legislature. Nor can it be said that the omission of the defense of 'voluntary abandonment' in connection with the crime of criminal attempt was either an oversight by the Legislature or due to its failure to know that such a defense could have been included when it adopted the criminal attempt statute in 1977. At the same time that § 28-201 was adopted, the Legislature also enacted Neb. Rev. Stat. § 28-202 (Reissue 1979), the crime of 'conspiracy.' As a part of the crime of criminal conspiracy, the Legislature specifically adopted the defense of abandonment or renunciation of criminal intent. See Neb. Rev. Stat. § 28-203 (Reissue 1979). The defense, however, was limited to the crime of conspiracy under § 28-202, and did not include criminal attempt, § 28-201. Schmidt concedes that this defense has never been adopted in Nebraska but maintains that this court should nevertheless treat abandonment as an affirmative defense to be judicially grafted into the statutes. If that portion of the Model Penal Code is to become a part of the substantive law of the State of Nebraska, it is for the Legislature to do, and not for this court. Since abandonment is not a defense

to the commission of the crime of criminal attempt under Nebraska law, Schmidt's assignment of error is without merit."

The defendant argues that the cassette sound recordings taken during the police surveillance of his conversations with Sherrill should not have been admitted into evidence. Three tapes were made; however, only tapes one and two, the June 2 conversation, were produced at trial. The police testified that the third tape, the June 3 conversation, had somehow been lost. The defendant argues that the ruling on his objections was an abuse of discretion under Neb. Rev. Stat. § 27-106 (Reissue 1979).

Section 27-106 provides: "(1) When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other. When a letter is read, all other letters on the same subject between the same parties may be given. When a detached act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence.

"(2) The judge may in his discretion either require the party thus introducing part of a total communication to introduce at that time such other parts as ought in fairness to be considered contemporaneously with it, or may permit another party to do so at that time."

The general rule regarding the admissibility of tape recordings is that recordings of relevant and material conversations are admissible as evidence of such conversations and in corroboration of oral testimony of the conversations, provided proper foundation is laid. *State v. Loveless,* 209 Neb. 583, 308 N.W.2d 842 (1981). Under this rule, tapes one and two were properly admitted.

However, the defendant argues that it was an abuse of discretion to admit the first two tapes when

the third tape, possibly exculpatory, could not be produced. The trial judge reasoned that the tapes were admissible since they were simply corroborative of the conversation and the oral testimony of the parties to the conversation was available.

The defendant's argument is based on the "rule of completeness," which states that an opponent may require one introducing part of a writing or statement to introduce any part which ought in fairness to be considered with the part introduced. See, Fed. R. Civ. P. 32(a)(4), which applies the rule to use of depositions; McCormick on Evidence § 56 (2d ed. 1972); Fed. R. Evid. 106, Notes of Advisory Committee.

The Nebraska statute does not automatically require that the proponent of evidence produce remaining portions of a writing or statement upon request by an opponent. Rather, it permits inquiry into the whole on cross-examination or introduction of the whole by the opponent. In his discretion a judge may require introduction of the remainder as fairness requires. See *Spani v. Whitney,* 172 Neb. 550, 110 N.W.2d 103 (1961) (predecessor statute).

Generally, the rule of completeness is concerned with the danger of admitting a statement out of context. *McCormick, supra.* When this danger is not present it is not an abuse of discretion to fail to require the production of the remainder or, if it cannot be produced, to exclude all the evidence. In the present case tapes one and two were admitted in their entirety. The defendant was free to cross-examine with regard to them. The third tape dealt with a different conversation on a different date. Both the State and the defendant were required to prove this conversation by oral testimony. Thus, neither party was placed at a greater disadvantage because the tape could not be found. Further, tapes one and two were not severed from the third tape in such a manner as to create an "out-of-context situation" envisioned by the rule. The admission of

tapes one and two was not an abuse of discretion.

The defendant further argues that the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), applies in this case. *Brady* requires proof that exculpatory evidence was intentionally kept from the defendant. See *United States v. Hooper,* 596 F.2d 219 (7th Cir. 1979).

Here, there was no evidence of bad faith in the loss of the third tape, nor that the information contained in the tape was intentionally withheld from the defense. Therefore, the rule in *Brady* was not applicable.

In his brief pro se the defendant contends that the $25 in currency received by Sherrill from the defendant was improperly admitted since it could have been on Sherrill's person before the meeting. The general rule is that the admissibility of physical evidence rests in the discretion of the trial court, and the determination of admissibility will not be overturned unless there is a clear abuse of discretion. *State v. Weible,* 211 Neb. 174, 317 N.W.2d 920 (1982). In the present case proper foundation was laid for the admission of the $25. The jury was free to decide whether or not to believe Sherrill's testimony. The credibility of a witness is an issue for the trier of fact; it is not the function of the Supreme Court to weigh the credibility of a witness. *Mustion v. Ealy,* 201 Neb. 139, 266 N.W.2d 730 (1978). There was no abuse of discretion in admitting the evidence.

The defendant next argues that because the only "overt act," the receipt of the $25 by Sherrill, took place in Iowa, the Nebraska court had no jurisdiction in this case. The defendant had engaged in much conduct in Nebraska aimed at bringing about the murder of Rickard, which was to occur in Nebraska. The $25 paid for the scope was but one of the substantial steps required by the statute.

Where requisite elements of the completed crime are committed in different jurisdictions, any state in which an essential part of the crime is committed

has jurisdiction of the offense. *State v. Hilpert, ante* p. 564, 330 N.W.2d 729 (1983); 21 Am. Jur. 2d *Criminal Law* § 345 (1981). In the present case the crime was to be committed in Nebraska and substantial steps to complete the crime had been taken in Nebraska. The fact that one act was committed in Iowa does not deprive the Nebraska courts of jurisdiction.

In *State v. Reldan,* 166 N.J. Super. 562, 567, 400 A.2d 138, 141 (1979), the court said: "[T]he state has cited the well-established principle that a sovereign has jurisdiction to try an offense where only part of that offense has been committed within its boundaries. See, *e.g., Leonard v. United States,* 500 *F.* 2d 673 (5 Cir. 1974) . . . ."

In *State v. Poland,* 132 Ariz. 269, 275, 645 P.2d 784, 790 (1982), the court said: "When the elements of a crime are committed in different jurisdictions, any state in which an essential part of the crime is committed may take jurisdiction. *State v. Scofield,* 7 Ariz.App. 307, 438 P.2d 776 (1968). 'Any element,' then, can confer jurisdiction. *State v. Bussdieker,* 127 Ariz. 339, 621 P.2d 26 (1980)."

The defendant contends that remarks by the prosecutor, which were not corrected by the court, made it impossible to receive a fair trial. The defendant asserts that in his opening and closing statements the prosecutor misstated the law of intent and made comments regarding incidents about which the defendant did not testify. The opening and closing statements are not a part of the record.

A bill of exceptions is the only vehicle for bringing evidence before the Supreme Court. *State v. Spurgeon,* 200 Neb. 719, 265 N.W.2d 224 (1978). Opening and closing statements must appear in the bill of exceptions before alleged errors concerning them can be reviewed. *Peery v. State,* 165 Neb. 752, 87 N.W.2d 378 (1958). In *State v. Harris,* 205 Neb. 844, 290 N.W.2d 645 (1980), we held that in order to predicate error upon an improper argument to the

jury, it is necessary to make an objection, receive an adverse ruling thereon, and have the same made part of the bill of exceptions. This assignment of error is without merit.

The defendant asserts that questioning by the prosecutor of the witness Sherrill regarding the tape recording was overly suggestive. The defendant's objections in this regard were overruled.

The propriety of the conduct of a prosecutor during the examination of witnesses falls within the discretion of the trial court. Absent bad faith and prejudice to the defendant, the action of the trial court with regard to the conduct will not be deemed an abuse of discretion. See, *State v. Brown,* 169 Conn. 692, 364 A.2d 186 (1975); *State v. Hafner,* 168 Conn. 230, 362 A.2d 925 (1975), *cert. denied* 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74. Since the tape itself was available for the jury, there was no prejudice to the defendant. There was no evidence to indicate the prosecutor acted in bad faith.

The defendant contends that the sentence was excessive. A sentence imposed within the statutory limits will not be overturned on appeal absent an abuse of discretion by the trial court. *State v. True,* 210 Neb. 701, 316 N.W.2d 623 (1982). The sentence was within the statutory range for Class II felonies. The minimum is 1 year and the maximum sentence is 50 years' imprisonment. See Neb. Rev. Stat. §§ 28-201(4), 28-105(1) (Reissue 1979).

The defendant is 40 years of age. He has a long prior record which includes several convictions and imprisonment for auto theft. In view of the violent and serious nature of the crime, there was no abuse of discretion in the imposition of the sentence.

The judgment is affirmed.

AFFIRMED.