******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

ECKER, J., dissenting. The majority concludes that the defendant's conversations with John Evans and the undercover "hitman," Michael Paleski, Jr., provided sufficient evidence for the jury to find beyond a reasonable doubt that the defendant committed the crime of attempted murder. I disagree that those preliminary discussions, without more, constitute a substantial step under General Statutes § 53a-49 and, therefore, I respectfully dissent.

I

Before getting to the heart of the case, I pause to express a minor concern with the methodological framework developed by the majority as a prelude to its finding that the evidence was sufficient to support the defendant's conviction of attempted murder. The majority describes the issue on appeal as whether the proper inquiry under the "substantial step" provision of our criminal attempt statute "should focus on what the [defendant] had already done or on what the [defendant] had left to do to complete the crime . . . ." The bulk of the court's opinion is devoted to examining that question and, after a lengthy discussion, the majority concludes that the "main focus" of the substantial step inquiry will be on what the defendant already has done. The majority then hastens to add that "the consideration of what the [defendant] has left to do is not completely irrelevant to the inquiry of whether he has taken a substantial step" and "the defendant is free to emphasize to the jury what he had left to do to commit the crime."

I intend no criticism of the majority's choice to address the "already-done versus remains-to-be-done" issue. The Appellate Court's decision in this case uses that dichotomous framework to reach its conclusion and the parties present their respective arguments to this court using that same approach. Under these circumstances, there is an obvious need for this court to clarify what the Appellate Court described as the "conflicting" case law invoking the "already-done versus remains-to-be done" approach. *State* v. *Daniel B.*, 164 Conn. App. 318, 327 and n.7, 137 A.3d 837 (2016) (citing cases from this court and Appellate Court reflecting inconsistent treatment). Nor do I disagree with the majority's basic conclusion on the issue: whether a criminal attempt has occurred will depend on what the defendant already has done, although what still remains to be done is not irrelevant to the analysis. My concern relates solely to the suggestion, implicit but unmistakable, that the "already-done versus remains-to-be-done" framework provides any meaningful guidance on the question of when preparation ends and attempt begins.

In the criminal law, the idea of an "attempt"—like the idea of a "substantial step"—is fundamentally and intrinsically a *relative* concept.[1] More particularly, these terms derive their content and meaning in significant part from a *terminal* reference point. An attempt to do what? A substantial step toward what end? These questions only can be answered by reference to the intended end point, regardless of whether it ultimately is achieved. I fully agree with the proposition that a criminal attempt under our law can (and usually will) occur before the defendant or his agent has taken the last step, or even the penultimate or antepenultimate step, necessary to complete the crime. The Model Penal Code, which has been adopted in Connecticut and many other jurisdictions, makes this point crystal clear. See 1 A.L.I., Model Penal Code and Commentaries (1985) § 5.01, comment 6 (a), p. 329. But it also is true, as the majority seems to acknowledge, that the ultimate objective cannot be ignored entirely when the critical question is whether the defendant's "step" toward that objective is a "substantial" one.

I believe that the "already-done versus remains-to-be-done" framework is ineffectual as a legal standard, at least in hard cases like this one, because it does little to resolve the central difficulty of locating the point at which planning ends and perpetration begins. I do not offer a better legal standard with brighter lines for easier application—nor do I believe that one exists.[2] I simply caution lawyers and trial judges that they should not expect the framework set forth in the majority opinion to provide particularly helpful guidance in resolving these difficult issues in cases where such guidance is most needed.

## II

I begin my analysis with the appropriate standard of review for claims challenging the sufficiency of the evidence. As the majority points out, "we apply a two-part test" to sufficiency of the evidence claims, which requires us first to "construe the evidence in the light most favorable to sustaining the verdict," and second, to "determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." *State* v. *Moreno-Hernandez*, 317 Conn. 292, 298, 118 A.3d 26 (2015). This standard of review undeniably requires great deference to the jury's verdict. But it does not negate or dilute the obligation of an appellate court reviewing a criminal conviction to ensure that the evidentiary basis for the conviction meets the constitutional "beyond a reasonable doubt" standard. See J. Newman, "Beyond 'Reasonable Doubt,' " 68 N.Y.U. L. Rev. 979, 980 (1993) (encouraging appellate courts "to take the [reasonable doubt] standard seriously as a rule of law against which the validity of convictions

is to be judged"). Our review, in other words, "is not entirely toothless . . . for [w]e do not . . . fulfill our duty through rote incantation of [the principles governing a review of sufficiency of evidence] followed by summary affirmance." (Citation omitted; internal quotation marks omitted.) *United States* v. *Salamanca*, 990 F.2d 629, 638 (D.C. Cir.), cert. denied, 510 U.S. 928, 114 S. Ct. 337, 126 L. Ed. 2d 281 (1993). Although "[a] jury is entitled to draw a vast range of reasonable inferences from evidence, [it] may not base a verdict on mere speculation"; id.; "and caution must be taken that the conviction not be obtained by piling inference on inference." (Internal quotation marks omitted.) *United States* v. *Jones*, 44 F.3d 860, 865 (10th Cir. 1995).

These cautionary precepts take on special relevance under the circumstances of the present case, in which the jury was not presented with the option of convicting the defendant of a lesser crime more closely matching his criminal conduct. "The sufficiency of the evidence warrants particular scrutiny when the evidence strongly indicates that a defendant is guilty of a crime other than that for which he was convicted, but for which he was not charged. Under such circumstances, a trier of fact, particularly a jury, may convict a defendant of a crime for which there is insufficient evidence to vindicate its judgment that the defendant is blameworthy. Compelling evidence that a defendant is guilty of some crime is not, however, a cognizable reason for finding a defendant guilty of another crime." *United States* v. *Salamanca*, supra, 990 F.2d 638; see also *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) ("It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.").

The defendant was convicted of the crime of attempted murder. Our attempt statute, § 53a-49, provides in relevant part that "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ." General Statutes § 53a-49 (a) (2). "In general terms . . . [a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime, and thus the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished before commission of the substantive crime. . . . In

order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 180–81, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006); see also *State* v. *Lapia*, 202 Conn. 509, 514–15, 522 A.2d 272 (1987) ("[t]he mere preparation to do something, absent an act constituting a substantial step toward the commission of a specific offense, is insufficient to sustain a conviction for criminal attempt").

Pursuant to § 53a-49 (b), "[c]onduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose. . . ." General Statutes § 53a-49 (b). "This formulation is used to distinguish acts of preparation from acts of perpetration" and it "requires *more* than a mere start of a line of conduct leading to the attempt." (Emphasis added.) Commission to Revise the Criminal Statutes, Commentary on Title 53a: The Penal Code (1969), pp. 28–29. The acts undertaken must be "substantial" and "unambiguous in supporting a criminal purpose." Id. Although, as a general matter, "[w]hat constitutes a substantial step in any given case is a question of fact"; (internal quotation marks omitted) *State* v. *Osbourne*, 138 Conn. App. 518, 528, 53 A.3d 284, cert. denied, 307 Conn. 937, 56 A.3d 716 (2012); the court must exercise its gatekeeping function to ensure that the defendant's conduct is "strongly corroborative of the actor's criminal purpose. . . ." General Statutes § 53a-49 (b); see also *United States* v. *Crowley*, 318 F.3d 401, 415 (2d Cir.) (noting that "the 'strongly corroborative' language" is used in Model Penal Code to instruct "courts as to what kinds of acts may be 'held' to be sufficient to constitute substantial steps"), cert. denied, 540 U.S. 894, 124 S. Ct. 239, 157 L. Ed. 2d 171 (2003); Model Penal Code and Commentaries, supra, § 5.01, comment 6 (c), p. 352 (noting that "the judge can refuse to submit the issue to the jury or refuse to accept the decision of the jury only if there is insufficient evidence of criminal purpose or there is no reasonable basis for holding that the defendant's conduct was 'strongly corroborative' of the criminal purpose attributed to him"). If the defendant's conduct is not substantial and strongly corroborative of his criminal purpose, then the evidence is insufficient as a matter of law to constitute a substantial step.

Subsection (b) of the statute lists seven examples of conduct that "if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law . . . ." General Statutes § 53a-49 (b). One of the enumerated circumstances is "soliciting an *innocent* agent to engage in conduct constituting an element of the crime. . . ." (Emphasis added.) General Statutes

§ 53a-49 (b) (7); see generally General Statutes § 53a-179a.[3] Indeed, the rule in Connecticut has long been that a solicitation, even if "accompanied by a bribe" or an "offer of money," is "never an attempt." *State* v. *Schleifer*, 99 Conn. 432, 438, 121 A. 805 (1923).

In *State* v. *O'Neil*, 65 Conn. App. 145, 782 A.2d 209 (2001), aff'd, 262 Conn. 295, 811 A.2d 1288 (2003), the Appellate Court expounded upon the distinction between solicitation and attempt. In *O'Neil*, the defendant was convicted of attempt to commit murder because he mailed a letter asking someone to kill a witness. Id., 148. The Appellate Court noted that in addition to the common-law distinction between the crimes of attempt and solicitation, the Model Penal Code, upon which our attempt statute is based, "counseled against classifying solicitations as attempts." Id., 164. Specifically, the commentary to § 5.02 of the Model Penal Code provides that "[w]hile attempts and solicitations have much in common and are closely related in their historical development, this section provides for separate definition of criminal solicitation on the ground that each of the two inchoate offenses [attempt and solicitation] presents problems not pertinent to the other." (Internal quotation marks omitted.) Id., quoting Model Penal Code and Commentaries, supra, § 5.02, comment 3, pp. 372–73. Additionally, "the inclusion of the 'innocent' agent formulation in § 53a-49 (b) (7) is a factor that reinforces the common-law distinction between solicitation and attempt," because by "including one specific solicitation situation in the attempt statute, it is logical to conclude that the legislature implicitly determined that other forms of solicitation, in and of themselves, do not constitute an attempt to commit a crime."[4] *State* v. *O'Neil*, supra, 167. In light of the distinction between the crimes of solicitation and attempt, which "has persisted for almost eighty years," the Appellate Court reversed the defendant's conviction because "[t]he conduct of the defendant consisted of a mere solicitation or a mere preparation—that is not enough to constitute an attempt." Id., 171; see also *State* v. *Damato*, 105 Conn. App. 335, 343–45, 937 A.2d 1232 (holding that evidence was sufficient to support defendant's conviction of attempted murder because defendant did not just solicit hitman, he also followed victim and surveilled victim's residence), cert. denied, 286 Conn. 920, 949 A.2d 481 (2008).

In the present case, there is no question that the defendant's conversations with Evans and Paleski constituted criminal solicitations in violation of § 53a-179a. The defendant, however, was not charged with the crime of solicitation to commit murder; he was charged with the crime of attempt to commit murder in violation of General Statutes §§ 53a-54a and 53a-49.[5] The question presented in this appeal is whether the defendant crossed the line between solicitation and attempt by taking a substantial step toward the commission of the

offense, i.e., whether he went beyond mere planning and preparation by committing acts strongly corroborative of his criminal purpose and of such a nature that a reasonable observer could conclude beyond a reasonable doubt that they were undertaken with the clear intent to commit the crime of murder.

"[T]he question of when preparation ends and attempt begins is exceedingly difficult." (Internal quotation marks omitted.) *United States* v. *Irving*, 665 F.3d 1184, 1195 (10th Cir. 2011), cert. denied, 566 U.S. 928, 132 S. Ct. 1873, 182 L. Ed. 2d 656 (2012); see also *United States* v. *Coplon*, 185 F.2d 629, 633 (2d Cir. 1950) (Hand, C. J.) ("[t]he decisions are too numerous to cite, and would not help much anyway, for there is, and obviously can be, no definite line" between preparation and attempt), cert. denied, 342 U.S. 920, 72 S. Ct. 362, 96 L. Ed. 688 (1952). I agree with the majority that the fact that "further major steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial." (Internal quotation marks omitted.) The majority, however, fails to give sufficient weight to the requirement that the steps already undertaken must be *substantial* and *strongly corroborative* of the actor's criminal intent in order to rise to the level of an attempt.

To determine whether the defendant's conduct in this case constituted a substantial step toward the commission of the crime of murder, sister state precedent is instructive. Although there is not a complete and uniform consensus as to what acts are sufficient to support a conviction of attempted murder in the murder-for-hire context; see *State* v. *Disanto*, 688 N.W.2d 201, 208 (S.D. 2004) (noting that "the courts are divided" in murder-for-hire cases); the general agreement among those states that have adopted the Model Penal Code definition of attempt is that more than mere conversation is required.[6] See *State* v. *Molasky*, 765 S.W.2d 597, 602 (Mo. 1989) (noting that, to constitute substantial step, there must be "something beyond conversation," such as "making a cash payment, delivering a weapon, visiting a crime scene, waiting for a victim, etc., [that] has accompanied the conversation, thus evidencing the seriousness of purpose, and making the planned crime closer to fruition"). To cross the line between criminal solicitation and attempt, the defendant must take some *action*, beyond the solicitation of a surrogate to commit the crime, strongly corroborative of his criminal purpose. Some examples of such action include the payment of money, surveillance of the victim, visiting the crime scene, furnishing the weapon for the commission of the offense, expressing urgency and certainty regarding the murder-for-hire plan, meeting with the hitman multiple times, and repeatedly importuning the hitman to commit the crime. See, e.g., *Martin-Argaw* v. *State*, 343 Ga. App. 864, 866, 806 S.E.2d 247 (2017) (affirming defendant's conviction of attempted murder because

"[t]he evidence in this case showed that [the defendant] had expressly asked the undercover officer—whom he believed to be a [hitman]—to kill three people; that he had given the [hitman] specific information about the three people to help him accomplish this purpose; that he had agreed to pay a negotiated price for the hit; that he had discussed the logistics of making the payment; and that he had responded affirmatively when the [hitman] made it clear that [the defendant] did not need to do anything else before the hit occurred"); *State* v. *Manchester*, 213 Neb. 670, 676, 331 N.W.2d 776 (1983) (affirming defendant's conviction of attempted murder because defendant "made plans for the murder, solicited a killer, discussed the contract price and set the money aside in his billfold, arranged for the weapon and a scope, and showed the killer the victim, his residence, and his place of work"); *State* v. *Kilgus*, 128 N.H. 577, 585, 519 A.2d 231 (1986) (holding that defendant's solicitation of another to commit murder, payment of $1000, identification of victim, and instruction to dispose of corpse out-of-state "was more than . . . 'mere' or 'naked' solicitation," rather, "[i]t was a 'substantial step' toward the commission of capital murder"); *State* v. *Fornino*, 223 N.J. Super. 531, 540, 539 A.2d 301 (App. Div.) (holding that "defendant's visits to the scene of the planned crime and his receipt of money for its commission could properly be found by the jury to constitute 'substantial steps in a course of conduct planned to culminate in the commission of the crime' which were 'strongly corroborative of the actor's criminal purpose' "), cert. denied, 111 N.J. 570, 546 A.2d 499 (1988), and cert. denied, 488 U.S. 859, 109 S. Ct. 152, 102 L. Ed. 2d 123 (1988); *State* v. *Group*, 98 Ohio St. 3d 248, 263, 781 N.E.2d 980 (2002) (holding that defendant's acts of "offering [an acquaintance] $150,000 to throw a firebomb through the window of [the intended victim's] house, providing him with her address, repeatedly importuning him to commit the crime, and instructing him how to make the bomb and how to misdirect any subsequent police investigation—strongly corroborate [his] criminal purpose, and therefore constitute a substantial step in a course of conduct planned to culminate in the aggravated murder of [the intended victim]"); but see *State* v. *Kimbrough*, 364 Or. 66, 89–90, 431 P.3d 76 (2018) (reversing defendant's attempted murder conviction even though defendant "intended all the substantive crimes to be committed by the hitman and . . . took steps toward realizing that goal," because "to be guilty of attempt, the defendant must personally engage in conduct that constitutes a substantial step, and that substantial step must be toward a crime that the defendant intends to participate in himself"). Without some substantial action, there is no way to distinguish between "people who pose real threats from those who are all hot air . . . ." *United States* v. *Gladish*, 536 F.3d 646, 650 (7th Cir. 2008) (noting that "[t]reating speech (even obscene speech) as the 'substantial step' would

abolish any requirement of a substantial step"); see also *United States* v. *Resendiz-Ponce*, 549 U.S. 102, 107, 127 S. Ct. 782, 166 L. Ed. 2d 591 (2007) (noting that under Model Penal Code, as well as common law, "mere intent to violate a . . . criminal statute is not punishable as an attempt unless it is also accompanied by significant conduct").[7]

In light of this extensive case law focused on the crime of attempt in the murder-for-hire context, and after a thorough review of the record in the present case, I conclude that the defendant's actions, although morally reprehensible and criminally punishable under our solicitation statute, are insufficient as a matter of law to constitute a substantial step toward the commission of the crime of murder. The events at issue occurred over a very short period of time,[8] during which the defendant was upset because he "was suppose[d] to have the kids [for visitation]," but his wife "didn't give [him] the kids" in accordance with his expectation. The defendant's conversations with Evans represent an initial attempt to find a hitman. The defendant met later that night to solicit Paleski, the supposed hitman. The defendant's meeting with Paleski, like his earlier meeting with Evans, was a solicitation to commit a crime. Although there were two solicitations (one of Evans and one of Paleski), two solicitations within the same day to commit the same crime do not add up to an attempt. By equating the defendant's efforts to hire a hitman with a substantial step toward the commission of the crime of murder, the majority blurs the important distinction between the crimes of solicitation and attempt—a distinction that has persisted in our case law for more than eighty years. The real issue is whether applicable law would permit a juror to conclude, beyond a reasonable doubt, that the defendant crossed the line between planning a murder and perpetrating a murder on the basis of his conversations with Evans and Paleski. I answer that question "no" for the following reasons.

At no point during his seventeen minute conversation with Paleski did the defendant express a clear and unambiguous intention to implement his murder-for-hire idea. No one can fairly read the full transcript of the conversation without detecting a degree of hesitation and equivocation on the part of the defendant.[9] When Paleski attempted to clarify the defendant's intent by asking him whether he wanted the would-be victim "out of the picture . . . ? Morte," the defendant responded equivocally: "[T]hat's where it's getting to . . . it's like . . . I wish we didn't need to be there but . . . ." The same ambivalence is repeated at numerous points during the conversation.[10] The defendant clearly stated that he "didn't put that [much] thought into the details" of his murder-for-hire idea because "it all happened fast, I fucking talked to fucking [Evans] tonight. [H]e said he was going to talk to somebody, he went

to talk to somebody, and then that was that. . . . [A]nd here I'm sitting with you I was expecting to talk to him." The defendant asked for the meeting with Paleski, but during that meeting he comes across as rushed, not resolute, as Paleski tries to engage him to help formulate more concrete plans. See Commission to Revise the Criminal Statutes, Commentary on Title 53a: The Penal Code (1969), p. 29 (noting that § 53a-49 "requires *more* than a mere start of a line of conduct leading to the attempt" [emphasis added]).

The majority makes much of the fact that the defendant provided Paleski with identifying information about the would-be victim, such as her name, address, appearance, work schedule, and automobile. The transmittal of this information was necessary, however, for Paleski to understand what he was being solicited to do; it did not elevate the crime of solicitation to the crime of attempted murder. Identifying information of this nature is part and parcel of the solicitation and preliminary planning of the crime; to treat it as part of the perpetration of the crime erodes the demarcation between solicitation and attempt. Moreover, if we look at this particular portion of the conversation to discern the *defendant's* state of mind, what stands out as significant is the fact that virtually all of the information provided by the defendant regarding the would-be victim was not offered by him until elicited by Paleski's direct, explicit, and extremely persistent questioning.[11]

I return to the fact that the only evidence of a criminal attempt in this case consists of the words spoken by the defendant to Evans and Paleski soliciting them to commit a crime, and the words spoken in the same discussion with Paleski sketching out, for the very first time, an incipient plan to commit that crime. The damning "actions" identified by the majority involve nothing more than the basic acts physically necessary to hold such meetings—the defendant drove his car, provided information to identify the would-be victim, and shared other basic information to begin planning the crime. There is no evidence that the defendant conducted any surveillance, obtained or furnished a weapon, "cased" the potential crime scene to test the viability of a plan, or took any *actions*, beyond mere solicitation, to implement his murder-for-hire idea. Indeed, the record reflects that the defendant affirmatively *declined* to take the one action that, under the particular circumstances of this case, would have demonstrated his firm intention to commit the crime—the payment of money. Paleski repeatedly informed the defendant that he would not "do shit without that money," but despite this knowledge, the defendant still declined to provide a cash down payment to Paleski that night. I do not suggest that the payment of money is a necessary prerequisite in all murder-for-hire cases; see *State* v. *Servello*, 59 Conn. App. 362, 373 and n.4, 757 A.2d 36, cert. denied, 254 Conn. 940, 761 A.2d 764 (2000); but I believe that

the act of making payment in *this* case, on *this* record, became the only reliable indicator of the defendant's actual intentions during the crucial time period at issue. Under the circumstances of this case—where the conversation has not moved beyond preliminary planning, the time period is short, the defendant's words reflect some uncertainty, and the defendant has been told in explicit terms that payment is an absolute prerequisite to any steps being taken toward commission of the offense—I would hold that the failure to provide payment is strongly indicative that a final decision to commit the crime has not been made. See *State* v. *Molasky*, supra, 765 S.W.2d 602. Because "a substantial step is evidenced by actions, indicative of purpose, not mere conversation standing alone"; (footnote omitted) id.; the record in this case, in my view, does not contain sufficient evidence to sustain the defendant's conviction of attempted murder.

Lastly, I note that there is absolutely no evidence in the record to support the majority's conclusion that the would-be victim was in imminent danger of harm, thus necessitating the defendant's immediate arrest. The defendant's commitment to his murder-for-hire idea was less than certain, but to the extent that the defendant intended to follow through with it, he made abundantly clear to Paleski that there was no "urgency of tonight" and that he "definitely [didn't] want to do anything at the house" or "near the kids," just as Paleski made it clear to the defendant that he would do absolutely nothing without being paid first. The majority's hypothesis that the defendant "could have killed [the victim] himself" before meeting with Paleski in the morning not only is unsupported by any record evidence, it is contradicted by that evidence.[12] If the authorities harbored any concerns whatsoever about the would-be victim's safety, moreover, they had ample evidence to arrest and charge the defendant with the crime of solicitation. The fact that the authorities decided to charge the defendant with the crime of attempted murder, rather than solicitation, does not diminish the state's burden to prove, beyond a reasonable doubt, that the defendant took a substantial step toward the commission of the offense.

Because there is insufficient evidence to prove beyond a reasonable doubt that the defendant committed any substantial acts strongly corroborative of his criminal intent, I would reverse the judgment of the Appellate Court. Accordingly, I respectfully dissent.

[1] See, e.g., *U.S. Industries/Federal Sheet Metal, Inc.* v. *Director, Office of Workers' Compensation Programs*, 455 U.S. 608, 619 n.3, 102 S. Ct. 1312, 71 L. Ed. 2d 495 (1982) (recognizing that "[t]he term 'substantial' is relative"); *Bausch & Lomb, Inc.* v. *Alcon Laboratories, Inc.*, 79 F. Supp. 2d 243, 249 (W.D.N.Y. 1999) ("[t]he word 'significant,' like 'substantial,' is a relative term that does not inherently convey any particular quantifiable standard"); *Fisette* v. *DiPietro*, 28 Conn. App. 379, 384, 611 A.2d 417 (1992) (holding that "the term 'substantial circulation' is relative"); *Saugus Auto Theatre Corp.* v. *Munroe Realty Corp.*, 366 Mass. 310, 311, 318 N.E.2d 615 (1974) (noting that "the word substantial . . . is a relative term and must be exam-

ined in its context to gauge its meaning" [internal quotation marks omitted]).

[2] Judges and legal scholars have long struggled to identify and articulate a coherent, workable theory of criminal attempt and, to this day, remain dissatisfied with the results. See J. Hall, "Criminal Attempt—A Study of Foundations of Criminal Liability," 49 Yale L.J. 789, 789 (1940) ("Whoever has speculated on criminal attempt will agree that the problem is as fascinating as it is intricate. At every least step it intrigues and cajoles; like la belle dame sans merci, when solution seems just within reach, it eludes the zealous pursuer, leaving him to despair ever of enjoying the sweet fruit of discovery."). A recent article sketches the intellectual history of this endeavor since Lord Mansfield's "discovery" of the crime of attempt in the late eighteenth century. See M. Fenster, "The Dramas of Criminal Law: Thurman Arnold's Post-Realist Critique of Law Enforcement," 53 Tulsa L. Rev. 497, 510 (2018) ("[t]he doctrine today remains as muddled and contentious as it was in Arnold's era [in the 1930s]; yet it continues to attract commentators who obsessively offer their own solutions as if only they and their pet theory can finally solve the doctrinal riddle" [footnote omitted]).

[3] General Statutes § 53a-179a provides in relevant part: "(a) A person is guilty of inciting injury to persons or property when, in public or private, orally, in writing, in printing or in any other manner, he advocates, encourages, justifies, praises, incites or solicits the unlawful burning, injury to or destruction of any public or private property or advocates, encourages, justifies, praises, incites or solicits . . . the killing or injuring of any class or body of persons, or of any individual.

"(b) Inciting injury to persons or property is a class C felony."

[4] The Appellate Court explained the inclusion of the "innocent agent" exception in § 53a-49 (b) as follows: "The example given in the Model Penal Code and Commentaries of why the language, 'soliciting an innocent agent,' was included as one of the seven examples of conduct or a situation that might be sufficient to satisfy the requisite conduct for attempt is an example attributed to Professor Glanville Williams. That example, as given, is: '(vii) *Solicitation of Innocent Agent.* Professor Glanville Williams suggests the situation where "D unlawfully tells E to set fire to a haystack, and gives him a match to do it with. . . . If, as D knows, E (mistakenly) believes that it is D's stack and that the act is lawful, E is an innocent agent, and D is guilty of attempted arson; D, in instructing E, does the last thing that he intends in order to effect his criminal purpose. (It would be the same if he only used words and did not give E a match.)"' Model Penal Code and Commentaries, supra, § 5.01, comment [6] (b) (vii), p. 346 [and] n.214, quoting G. Williams, Criminal Law: The General Part (2d Ed. 1961) p. 616.

"As the defendant points out, the commentary on Professor Williams' example explains that '[t]he prohibition against criminal solicitation does not apply in this case because *E* is himself not being incited to commit a crime. For this reason *E* is not in a position, as an independent moral agent, to resist *D's* inducements; unlike the situation in criminal solicitation, *E* is wholly unaware that commission of a crime is involved. Analytically, therefore, *D's* conduct, in *soliciting an innocent agent*, is conduct constituting an element of the crime, which is properly subsumed under the attempt section; and the solicitation, irrespective of whether it happens to be the last act, should be the basis for finding a substantial step toward the commission of a crime.' . . . Model Penal Code and Commentaries, supra, § 5.01, comment [6] (b) (vii), pp. 346–47. So E, being an 'innocent agent,' wholly unaware that a crime is involved, is not in the position to resist or reject D's requests; whereas a noninnocent agent, in that situation, knowing this criminal activity is afoot is free to accept or reject D's requests. The 'innocent agent' can fairly be said to include one who is clear of responsibility because for example, he lacks mens rea; E would fall into that category. Therefore, D's conduct, in soliciting E, an innocent agent, is conduct constituting an element of the crime, which comes within § 53a-49 (b) (7) of the attempt section and the solicitations, 'irrespective of whether it happens to be the last act, should be the basis for finding a substantial step toward the commission of a crime.' Id." (Emphasis in original.) *O'Neil*, supra, 65 Conn. App. 166–67.

[5] Solicitation to commit murder is a class C felony punishable by "a term not less than one year nor more than ten years"; General Statutes § 53a-35a (1) (A) (7); whereas attempt to commit murder is a class B felony punishable by "a term not less than one year nor more than twenty years . . . ." General Statutes § 53a-35a (1) (A) (6); see also General Statutes § 53a-51 ("[a]ttempt and conspiracy are crimes of the same grade and degree as the most serious offense which is attempted or is an object of the conspiracy, except that

an attempt or conspiracy to commit a class A felony is a class B felony"); General Statutes § 53a-179a (b) ("[i]nciting injury to persons or property is a class C felony"). The defendant was sentenced to twenty years of incarceration, execution suspended after fifteen years, and five years of probation with special conditions.

[6] Many of the states that have not adopted the Model Penal Code definition of attempt require the defendant to have taken *more* than a substantial step and be dangerously close to the commission of the offense. See, e.g., *Commonwealth* v. *Hamel*, 52 Mass. App. 250, 256, 752 N.E.2d 808 (reversing defendant's attempted murder conviction, even though defendant solicited two undercover officers posing as hitmen, agreed upon price, offered goods and property as "upfront payment," provided "descriptions of [victims] and their habits," and produced sketches of victims' home, because "[t]here were no acts, on the part either of the defendant or of the officers, that came close to or formed part of any physical perpetration of any murders"), cert. denied, 435 Mass. 1104, 759 N.E.2d 328 (2001); *State* v. *Melton*, 821 S.E.2d 424, 431–32 (N.C. 2018) (reversing defendant's attempted murder conviction, even though defendant met "with the supposed hired killer, tender[ed] the [$2500] in cash as an initial payment, provid[ed] the hired killer the details necessary to complete the killing of defendant's former wife, and help[ed] the hired killer plan how to get his former wife alone and how to kill her out of the presence of their daughter," because such acts, "calculating as they are, [do] not amount to proof of overt acts" because they would not, without more, "inexorably result in the commission of the offense" [internal quotation marks omitted]); *State* v. *Disanto*, supra, 688 N.W.2d 207, 213 (reversing defendant's attempted murder conviction, even though defendant gave "the [hitman] a final order to kill," because defendant's actions did not go "beyond preparation into acts of perpetration"). Other states with different formulations of the crime of attempt also require more than the mere solicitation and hiring of a hitman—the defendant must have committed slight or overt acts exhibiting his firm intention to commit the crime of murder. See *Braham* v. *State*, 571 P.2d 631, 637 (Alaska 1977) (holding that solicitation plus commission of overt acts is enough to sustain conviction of attempted murder, and concluding that evidence was sufficient because defendant and hitman "entered into a contract . . . to kill [the intended victim]," settled "on the contract price [of] $600," and defendant committed overt act by having hitman visit victim in hospital to gain victim's trust), cert. denied, 436 U.S. 910, 98 S. Ct. 2246, 56 L. Ed. 2d 410 (1978); *State* v. *Mandel*, 78 Ariz. 226, 229, 278 P.2d 413 (1954) (The court affirmed the defendant's conviction of attempted murder because the defendant "not only solicited, she consummated the contract to that end and partly executed the same by payment of a portion of the consideration; she identified for the intended assassin the home and the car of the intended victim, pointed out a possible site for disposition of the body and advised the place and time when and where contact could be made for the consummation of the murder. She did everything she was supposed to do to accomplish the purpose. Had it not been for the subterfuge, the intended victim would have been murdered."); *People* v. *Superior Court (Decker)*, 41 Cal. 4th 1, 9, 157 P.3d 1017, 58 Cal. Rptr. 3d 421 (2007) (affirming defendant's attempted murder conviction because defendant solicited and hired hitman, agreed on price, provided hitman "with all of the necessary information concerning [the victim], her home and office, and her habits and demeanor," gave the hitman "the agreed-on [down payment] of [$5000]" and expressed that he was " 'absolutely, positively, 100 percent sure' " he wanted murder committed); *Saienni* v. *State*, 346 A.2d 152, 153–54 (Del. 1975) (affirming defendant's attempted murder conviction because defendant procured life insurance on victim, contracted hitman, traveled to Maryland with hitman and "pointed out the entire physical layout and discussed step by step how the murder was to be accomplished," "discussed and rehearsed the murder in great detail" in subsequent meetings with hitman, and "started [the] sequence of events" planned to culminate in murder); *Duke* v. *State*, 340 So.2d 727, 730 (Miss. 1976) (affirming defendant's attempted murder conviction because defendant's acts "went far beyond mere preparation and planning because he solicited [his employee] to kill [the intended victim], arranged a hunting trip for that purpose, and following the failure to kill [the intended victim] during the . . . hunting trip, he again solicited [his employee] to find a [hitman], agreed to pay $15,000 to have [the intended victim] killed, and actually paid $11,500 to a person whom he believed had killed [the intended victim]"); *State* v. *Burd*, 187 W. Va. 415, 419, 419 S.E.2d 676 (1991) (affirming defendant's attempted murder conviction because defendant "not only had

several conversations with [the hitman], but gave him $150 to purchase a weapon and $500 as a down payment for the commission of the murders; promised to pay another $550 upon completion of the crimes; gave him a sketch of the crime scene and descriptions of the intended victims; gave him a suicide note and instructed him on how to make the murders look like murder-suicide; instructed him on where to inflict the gun shots; and finally, took [the hitman] and physically showed him the intended victims' home"); but see *State* v. *Gay*, 4 Wn. App. 834, 840, 486 P.2d 341 (1971) (holding that hiring hitman constitutes overt act that "goes beyond the sphere of mere solicitation and . . . may constitute the crime of attempt" where defendant had hired hitman, agreed on price, and provided down payment, pictures and information about victim).

[7] The majority cites only a single case, *State* v. *Urcinoli*, 321 N.J. Super. 519, 729 A.2d 507 (App. Div.), cert. denied, 162 N.J. 132, 741 A.2d 99 (1999), that upholds a conviction on facts anywhere close to those in the present case. The vast majority of cases employing the Model Penal Code standard—our legal standard in Connecticut—require some action beyond mere conversation as a "substantial step" toward the commission of the crime of attempted murder.

[8] I disagree with the majority that the evidence was sufficient for the jury reasonably to find that "the defendant had begun his planning well in advance of June 9 . . . ." The defendant may have *thought about* killing his wife prior to June 9, but it is "[o]ne of the basic premises of the criminal law . . . that bad thoughts alone cannot constitute a crime. This is no less true as to an attempt . . . ." (Footnote omitted.) 2 W. LaFave, Substantive Criminal Law (3d Ed. 2018) § 11.4; see also Model Penal Code and Commentaries, supra, § 2.01, comment 1, p. 214 ("[i]t is fundamental that a civilized society does not punish for thoughts alone"). There are important and critical distinctions between *thinking* about the commission of a crime, *planning* the commission of a crime, and *perpetrating* a crime. The defendant did not pursue the notion of putting his bad thoughts into motion until the day he met Evans and Paleski, June 9, 2011, and, even then, he did not *do* anything to take his idea beyond the realm of preliminary planning and preparation.

[9] A complete copy of the transcript of the defendant's conversation with Paleski, which has been redacted to protect the privacy of the would-be victim, is attached as a Joint Appendix to the Majority and Dissenting Opinions.

[10] The record reflects the following colloquies between the defendant and Paleski:

[Paleski]: you want her completely out of the picture right? Morte

[The Defendant]: that's where it's getting to . . . it's like

[Paleski]: that's what you want? Alright brother

[The Defendant]: I wish we didn't need to be there but . . .

[Paleski]: well I mean

[The Defendant]: you know

\* \* \*

[Paleski]: and this is what you want . . just so know I'm going to put 2 in that bitches head and take that car and be gone and I'll fucking burn it somewhere

[The Defendant]: that's the only way that I [c]an come up . . . that I thought from my like that . . . it makes sense you know what I mean it's gonna hopefully like going to make it not . . ya' know . . . how? What am I? . . . ya' know what I mean? . . . I don't fucking know . . all know is I'm going to be fucking hemmed up in fucking jail again."

[11] For example, the record reflects the following colloquy between the defendant and Paleski:

[Paleski]: who's this the ex-wife?

[The Defendant]: to be or what you know

[Paleski]: alright alright what's her name?

[The Defendant]: [T's full name redacted]

[Paleski]: [T] you got an address and shit? . . alright

[The Defendant]: Yes, she works the night shift

[Paleski]: she got a job?

[The Defendant]: yea

[Paleski]: where at?

[The Defendant]: Stamford Hospital

[Paleski]: alright . . she works every night or part time?

[The Defendant]: only like 1 or 2 nights a week

[Paleski]: alright . . . she lives in Stamford?

[The Defendant]: yea

[Paleski]: what's the address?

[The Defendant]: [T's street address redacted]

[Paleski]: what's the number?

[The Defendant]: [T's street address number redacted]

[Paleski]: . . . ok . . . alright . . you (got) have a picture of her or anything?"

The defendant had not brought a printed photograph of the would-be victim to the meeting, but showed Paleski a photograph that he had on his cell phone in response to Paleski's inquiry. Similarly, the information on the piece of paper the defendant gave to Paleski was information that Paleski specifically requested:

[Paleski]: I ain't got shit in here but can you get me a piece of paper and write down her name

[The Defendant]: yup

[Paleski]: house address

[The Defendant]: yup

[Paleski]: hospital name

[The Defendant]: yup

[Paleski]: what kind of car she drives

[The Defendant]: mm hmmmm

* * *

[Paleski]: write it all . . . write that shit down for me

[The Defendant]: alright."

[12] The majority's conclusion is predicated in part on an episode of alleged domestic violence between the defendant and the would-be victim on March 9, 2011. On that date, the would-be victim accused the defendant of attempting to push her down the stairs, but the defendant denied engaging in the alleged conduct. The defendant subsequently was charged with violation of a criminal protective order under General Statutes §§ 53a-223 and 46b-38c (e) based on the March 9 allegations, and the jury in the present case *acquitted* the defendant of the charged crime. Outside of those allegations, there was no claim of any history of physical violence perpetrated on the would-be victim by the defendant. Indeed, the would-be victim testified at trial that the defendant never had struck her or threatened her physically.

---